**EXHIBIT A**

## III. WHAT ARE THE FACTS UNDERLYING YOUR CLAIM(S)?

### A. The Traffic Stop and Initial Encounter

1. On January 20, 2023, Defendant Trooper Pedroza initiated a traffic stop of Plaintiff Angel Alanis in Mission, Texas, for an alleged speeding violation.

2. The bodycam footage begins with the camera oriented downward, showing only Defendant's khakis and the steering wheel area. At 0:12, audio begins, confirming that Defendant had interacted with his camera at least once before approaching Plaintiff's vehicle.

3. This pre-approach camera positioning created a blind spot that prevented recording of Defendant's initial observations and Plaintiff's actual hand movements during the critical first minutes of the encounter.

4. At the start of the stop, Defendant asked Plaintiff for license and insurance. Plaintiff immediately began searching for his wallet and informed Defendant at 1:55: "I'm looking for my wallet right now."

5. For over one minute while Plaintiff searched for his wallet, Defendant engaged him in casual conversation about:
    - Text messages and phone contacts ("Texting anybody or what?" at 1:23)
    - Plaintiff's mother's name ("What's your mom's name?" at 1:42)

- A contact named Sabrina

- The origin and destination of Plaintiff's travel

Defendant maintained a relaxed demeanor and engaged in casual questioning throughout this
period with no mention of criminal activity or officer safety concerns.

6. Throughout this initial minute, Plaintiff declared three separate times that he was "looking for
[his] wallet" (at 1:55, 2:35, and 2:43), providing a legitimate explanation for any movements
Defendant observed.

7. At 2:22, while maintaining the same relaxed body position with his left leg bent slightly
forward, Defendant asked vaguely: "Why'd you have that USB down there between your legs?"
followed by "what else you got under there, you sitting on anything?" (at 2:30).

8. Plaintiff responded to these vague questions by explaining for the second time: "Uh no, but I
am looking for my wallet" (at 2:35).

9. At 2:48, Plaintiff successfully located his driver's license and exclaimed "Oh, here it is!"
thereby completing the legitimate purpose of the traffic stop.

## B. The Unlawful Extension and Warrantless Search

10. Instead of taking the license and returning to his patrol car to process the traffic citation,
Defendant silently walked to the driver's side at 2:54.

11. At 3:02, without any announcement, warning, or request for permission, Defendant opened Plaintiff's driver's door—initiating a search of Plaintiff's vehicle that occurred after the traffic stop's purpose.

12. The bodycam footage from 3:02 forward clearly shows Plaintiff's legs and hands, documenting that no furtive movements or hiding actions occurred from this moment until Plaintiff exited the vehicle.

13. Critically, despite later claiming in his report that he had already observed Plaintiff "hiding something with his left hand" and had safety concerns, Defendant opened the door in a casual, non-tactical manner—no weapon drawn, no defensive positioning, no backup called. These actions are inconsistent with the behavior of an officer who genuinely believes a suspect is hiding something potentially dangerous.

14. Upon opening the door, Defendant immediately observed a legal Delta-8 THC vape package on the floorboard that had been in plain view the entire time.

15. At 3:24, Defendant asked "So is this what you were hiding?"—marking the first time during the encounter that Defendant used the word "hiding," and only after seeing the legal Delta-8 package.

16. This sequence demonstrates that Defendant's later claim of observing "hiding" behavior during the initial wallet search was a post-hoc assertion designed to justify his unlawful door opening and search.

## C. The Contradictory Commands and Manufactured Non-Compliance

17. At 3:31, Defendant ordered Plaintiff to exit the vehicle.

18. At 3:46, Defendant ordered Plaintiff to "turn around that way." Plaintiff began complying, shifting his torso to the left. Defendant later characterized this commanded movement in his report as suspicious behavior, claiming Plaintiff was "turning/blading his body away from Trooper Pedroza," even though this was a movement he had ordered.

19. At 3:56, Defendant ordered: "So what I want you to do right now is empty your pockets."

20. As Plaintiff began complying with this direct order by reaching into his pockets, Defendant abruptly yelled: "uh uh uh, get your hand out, get your hand out!"—creating a physically impossible situation where Plaintiff could not comply with both commands simultaneously.

21. This pattern of contradictory commands continued when Defendant pointed to the right pocket saying "This one right here first," then after Plaintiff emptied it and began complying with the implied order to empty the left pocket, Defendant again yelled: "no no no, Get your hand out, get your hand out!" (at approximately 4:10).

22. These contradictory commands served no legitimate law enforcement purpose and instead created confusion and the false appearance of non-compliance, escalating what had been a calm interaction.

## D. The Weapon Pretext and Implausibility of Officer's Account

23. At 4:46, after Defendant had already searched and found pills in Plaintiff's pockets, Defendant asked "Where are your prescriptions at?"

24. When Plaintiff began to retrieve his prescriptions from the glove box to verify his medication, Defendant commanded "no no no, stay over here," preventing Plaintiff from obtaining the documentation that would have verified the legality of his medication.

25. At 5:16, after preventing prescription verification, Defendant ordered Plaintiff to "go ahead and just turn around, let's empty your other pocket."

26. Only at this point—at 5:16 when Plaintiff turned as ordered—could Defendant have first observed any bulge in Plaintiff's back pocket area, as this was the first time that the left pocket area was oriented toward Defendant.

27. Defendant immediately reached and felt the back pocket area and at 5:45 asked "What do you have in your person?" while grabbing Plaintiff's arms.

28. At 5:48, Defendant placed Plaintiff in handcuffs, later claiming in his report that "As Alanis made that movement to hide what he had in his pants, Trooper Pedroza placed Alanis in handcuffs for his safety due to not knowing if Alanis had any sort of weapons"—asserting both active concealment behavior and immediate safety concerns. However, any items in Plaintiff's pants were already concealed before the stop began, and there is no observable movement or opportunity for further "hiding" during this part of the encounter. Moreover, the object felt was a small, soft baggie, not a weapon or weapon-like item, and Defendant made no contemporaneous statements or actions indicating a genuine belief that Plaintiff was armed.

28a. The handcuffing of Plaintiff was not supported by any legitimate officer safety concern or probable cause. Defendant's own bodycam footage and actions demonstrate that the decision to handcuff Plaintiff was based solely on a narrative of "hiding" and "weapon concern" that is directly contradicted by the video evidence and by Defendant's own contemporaneous conduct. At no point did Defendant observe any weapon or make any effort to secure a supposed weapon; instead, he allowed Plaintiff's hands to remain over the alleged "weapon" location for an extended period, and did not call for backup or express any urgency.

28b. The use of handcuffs in this context was an unreasonable escalation of force and a clear manifestation of the unlawful seizure, as Plaintiff was subjected to physical restraint and public humiliation based on contradictory and impossible commands. The handcuffing was not justified by objective facts presented in the video evidence and occurred after Defendant's extension of the stop and search, and subsequent contradictory commands.

29. Critical Contradiction: Despite claiming fear that the bulge was a weapon, Defendant then allowed Plaintiff's handcuffed hands to hang directly over this alleged weapon location in the back pocket area for 25 full seconds (from 5:53 to 6:18 as shown on bodycam).

30. During these 25 seconds, Defendant made no attempt to:

  - Move Plaintiff's hands away from the alleged weapon location

  - Secure any item from the back pocket

  - Express any urgency about the supposed weapon threat

  - Call for backup despite the alleged weapon concern

— Actions not consistent with immediate officer safety concerns as later claimed.

## E. Shifted Timeline and False Statements in Official Reports

31. In his sworn probable cause affidavit dated January 20, 2023, Defendant made multiple false statements that created a shifting in the timeline of events:

32. False Statement #1: Defendant swore he "identified the driver as Angel Alanis" before conducting any search. The bodycam proves identification occurred only at 10:07, after Plaintiff was already arrested and in the patrol car.

33. False Statement #2: Defendant swore he observed Plaintiff "hiding something with his left

hand" during the initial traffic stop conversation before any search began. The bodycam footage

and Defendant's own statements prove this is false:

33a. The Truth: Defendant's own words in the patrol car revealed when he actually observed the

alleged 'hiding with left hand." He stated: "And every time that you turned and I asked you, hey,

let's check this side, you kept turning and one of your hands kept moving around. Okay, so you

are hiding it sir." This statement specifically places the "left hand hiding" observation during the

pat-down search phase—when Defendant was asking Plaintiff to "check this side"—not during

the initial wallet search.

33b. The Timeline Proves the Lie: Defendant's patrol car statement creates an irreconcilable

timeline:

- IN THE PATROL CAR: Defendant says the "hiding" occurred when "I asked you, hey,
  let's check this side" (during the search)
- IN THE AFFIDAVIT: Defendant swears the "hiding" occurred during the initial
  conversation (before the search)

33c. Defendant's Lack of Pre-Search Hiding Concern: During the actual traffic stop, before

opening the door, Defendant's stated concerns were about Plaintiff "throwing things around" and

"sitting on" things—he never mentioned seeing Plaintiff "hiding" anything. The word "hiding"

first appeared only after Defendant opened the door and saw the legal Delta-8 package.

33d. The Contradictory Commands Context: When Defendant referenced "you kept turning and one of your hands kept moving around," he was describing Plaintiff's movements during the contradictory commands phase of the search—when Defendant ordered "empty your pockets" then immediately yelled "get your hands out!" These movements occurred because Plaintiff was trying to comply with impossible simultaneous commands, not because he was hiding anything.

33f. The Physical Impossibility: Even if Defendant had observed left hand movements during the wallet search (which the downward camera angle makes unverifiable), the bodycam proves Plaintiff had nothing in his left hand to hide. All items found were already concealed on Plaintiff's person before the stop began—making any claim of observing active "hiding" physically impossible.

33g. The Critical Admission: By stating "you kept turning and one of your hands kept moving around" in direct reference to the pat-down phase, Defendant indicated that the "left hand hiding" he cited as justification for his search actually occurred after the search had already begun. The bodycam footage and audio do not show Defendant making any contemporaneous comments about Plaintiff hiding an object or expressing concern about Plaintiff's left hand prior to the search. There are no statements in the footage where Defendant describes seeing a suspicious object, instructs Plaintiff to keep his hands visible, or calls for backup due to safety concerns before initiating the search. The first use of the term "hiding" by Defendant appears only after the door is opened and the legal Delta-8 package is observed. This sequence of events is consistent with the bodycam's chronology and does not reflect any immediate or specific safety response by Defendant prior to the search.

34. False Statement #3: Defendant swore he observed a "bulge in the back pocket area" that made him fear for his safety before placing Plaintiff in handcuffs. The bodycam shows:

- This area was not visible to Defendant until 5:16 when he ordered Plaintiff to turn

- The 25-second delay in securing the alleged weapon reveals no genuine safety concern existed

- This observation could only have occurred during, not before, the search

35. False Statement #4: Defendant swore in his affidavit that Plaintiff possessed "prescription medication without a prescription." This statement was false because:

- Defendant prevented Plaintiff from retrieving prescription documentation from the glove box

- Defendant later found Nardil medication with a visible CVS prescription label (see ¶49)

- Defendant refused to verify prescriptions when Plaintiff specifically offered to show them

- Defendant actively prevented Plaintiff from retrieving prescription documentation, and then claimed lack of prescription in his affidavit

## F. Post-Arrest Statements and Pattern of Narrative Shifting

36. After placing Plaintiff in the patrol car, Defendant attempted to create an audio record supporting his false narrative through leading questions.

37. At approximately 11:30, Defendant asked: "Well why would that pack be inside your underwear?"—introducing for the first time a claim about underwear concealment that appears nowhere in his contemporaneous statements during the stop and only emerged after Defendant discovered items in that location, indicating that this was a post-hoc assertion made to explain his discovery.

38. When Plaintiff responded "I wasn't specifically trying to keep them from you. They were already there before the lights turned on," Defendant became agitated and repeatedly interrupted, yelling "No sir, you were hiding them."

39. Critical Admission: In the patrol car, Defendant stated: "Right here you're concealing. You had it in your pants, when I asked you what you had in your pants and what it was you were hiding you told me, you said you had nothing."

40. By stating "You had it in your pants," Defendant admitted on camera that the items were already in Plaintiff's pants before the encounter—directly contradicting his sworn claim of observing active "hiding" behavior during the stop.

## G. Physical Impossibility of the Hiding Narrative

41. During the search, Defendant discovered on Plaintiff's person:
   - Fourteen (14) blister packages of pills
   - Multiple loose pill baggies

- Additional pills later found in Plaintiff's shoes during jail booking (that Defendant missed)

After a thorough search of the vehicle, no contraband or pills were located anywhere except on Plaintiff's person.

42. Each blister package was approximately the size of a pack of Dentyne Ice gum, made of reflective metallic material that would be highly visible during any transfer or concealment attempt.

43. The sheer volume of items—14 large, reflective packages plus multiple baggies—would have required extensive, time-consuming, and highly visible movements to transfer from any location to concealment on Plaintiff's person.

44. Despite claiming to observe "hiding," Defendant never asked specific questions like:
   - "What is that silver/blue thing in your hand?"
   - "What are those packages I see you moving?"
   - "What did you just put in your pocket?"

Throughout the encounter, Defendant's questions did not reference the presence or movement of any packages or any concealment activity.

45. Defendant's own report states both the center console and glove box were empty, eliminating these as possible sources for the packages to have been retrieved from to then be concealed.

46. Defendant never claimed Plaintiff accessed his backpack or gym bag during the stop, and both were later searched without finding any contraband, eliminating these as sources as well.

47. For Defendant's narrative to be true, Plaintiff would have needed to:

- Retrieve 14 large, reflective packages from thin air (no source identified) or from plain view sight

- Transfer all items to his person while searching for his wallet

- Accomplish this one-handed (per Defendant's "left hand" claim)

- Do so without Defendant seeing any reflective packages

- Additionally place pills in his shoes without detection

- All while maintaining casual conversation about his mother

48. Because the bodycam was pointed downward, the footage does not show Plaintiff's hands, lap, or any area where the alleged transfer or concealment of packages could have occurred. Defendant's own report confirms the glove box and center console were empty, and he never claimed Plaintiff accessed the backpack or gym bag—leaving no possible source from which Plaintiff could have obtained 14 large packages to then "hide" on his person during the stop.

## H. Evidence Preservation and Chain of Custody Issues

49. During the vehicle search, Defendant found Plaintiff's prescribed Nardil medication in a CVS bag with a visible prescription label from a U.S. pharmacy, demonstrating that Plaintiff

possessed at least some medications with valid prescriptions and supporting his claim that he had prescriptions for other medications.

50. At 21:10, while searching Plaintiff's backpack, Defendant found another legal Delta-8 vape box and exclaimed "THC, that's another charge right there," demonstrating either ignorance of the law or overcharging, as Delta-8 THC is legal under both Texas and federal law.

51. The bodycam shows Defendant knew exactly where to position items for the camera to capture them, proving he was aware of his camera's downward angle and could have corrected it at any time.

## I. The Transportation and Booking

52. Despite claiming in his report that he feared Plaintiff had a weapon, Defendant transported Plaintiff to jail in the front passenger seat of his patrol car—placing an allegedly armed suspect within arm's reach during transport.

53. This transportation decision placed an allegedly armed suspect within arm's reach of Defendant during the drive to jail.

54. During jail booking, officers discovered pills in Plaintiff's shoes that Defendant had failed to find during his roadside search, demonstrating both the pre-positioned nature of all items and the inadequacy of Defendant's search.

## J. False Official Documentation

55. Defendant submitted at least two official documents containing verifiable falsehoods:

   - The probable cause affidavit (January 20, 2023)

   - The offense report

56. Each false statement was made under penalty of perjury and was designed to create a narrative that would survive judicial scrutiny while concealing the constitutional violations.

57. As detailed above, Defendant's sworn reports and affidavits contain multiple statements directly contradicted by contemporaneous video and audio evidence, supporting Plaintiff's claims of deliberate falsification.

## K. Consequences of Conduct

58. As a direct result of Defendant's conduct, Plaintiff was incarcerated for 8 days at Hidalgo County Jail.

59. During this incarceration, Plaintiff was forced to withdraw from prescribed MAOI medication (Nardil) without medical supervision, creating serious health risks.

60. Toxicology results later showed no illegal substances in Plaintiff's system, only cannabinoids consistent with legal Delta-8 use.

61. All criminal charges against Plaintiff were ultimately dismissed, but only after Plaintiff suffered 8 days of unlawful incarceration, months of pending criminal charges and forced medication withdrawal.

62. No other officers were present during the traffic stop, eliminating any claim of corroboration for Defendant's version of events.

## L. Discovery of the Violations and Tolling

63. Plaintiff could not have discovered the full extent of Defendant's constitutional violations without access to the bodycam footage and official reports.

64. While incarcerated and during the pendency of criminal charges, Plaintiff had no ability to obtain or analyze the bodycam footage that would reveal discrepancies between Defendant's statements and the recorded evidence.

65. Even Plaintiff's criminal defense attorney, who did not receive the bodycam footage until after September 23, 2023, did not detect the temporal impossibilities and contradictions embedded in Defendant's reports—demonstrating the sophisticated nature of the deception.

66. Only through careful frame-by-frame analysis comparing the bodycam footage to Defendant's written reports could the full extent of the contradictions and discrepancies be discovered.

67. Plaintiff first obtained and was able to thoroughly analyze the bodycam footage and reports on June 20, 2025, at which point the constitutional violations and fraudulent concealment became apparent.

68. Plaintiff filed this complaint promptly after discovering the violations, well within any applicable statute of limitations as tolled by Defendant's fraudulent concealment.

## M. Fraudulent Concealment Preventing Discovery

69. Defendant's fraudulent concealment was specifically designed to prevent discovery of his constitutional violations:

70. Concealment Method #1: Downward camera positioning created unverifiable "observations" during crucial moments.

71. Concealment Method #2: False temporal sequencing in reports made it appear observations occurred before searches rather than during them.

72. Concealment Method #3: Post-arrest audio "interviews" created a record suggesting admissions that never occurred.

73. Concealment Method #4: Using vague terminology ("hiding," "blading") that courts often credit without requiring specific detail.

74. Concealment Method #5: Claiming fear of weapons to justify searches while behavior (opening door unannounced, 25-second delay, front-seat transport) proved no such fear existed.

75. These concealment methods were sophisticated enough to prevent detection by criminal defense counsel, demonstrating they were designed to survive the exact scrutiny they would receive.

76. Texas law enforcement agencies do not provide bodycam footage without formal legal requests, preventing Plaintiff from discovering the undisclosed contradictions through ordinary diligence.

77. Defendant's deliberate concealment—including downward-facing camera positioning, false sequencing in reports, use of ambiguous terminology, and obstruction of exculpatory evidence—prevented Plaintiff and his counsel from discovering the true nature and timing of the constitutional violations, despite reasonable diligence. Although Plaintiff's criminal defense attorney was permitted to review the bodycam footage in 2023, the manner in which the evidence was presented, combined with the limitations on access and the sophisticated

concealment methods employed by Defendant, made it impossible for Plaintiff or his counsel to discover the violations at that time. Only after the conclusion of the criminal case, when Plaintiff was able to obtain full and unrestricted access to all relevant evidence and conduct a detailed, frame-by-frame analysis, could the full extent and nature of the constitutional violations be revealed. Accordingly, the statute of limitations should be tolled under the doctrine of fraudulent concealment until the date Plaintiff actually discovered, or reasonably could have discovered, the facts giving rise to these claims. Defendant should not be permitted to benefit from his own deception to evade accountability for the constitutional violations alleged herein.

### N. Recurring Falsification and Timeline Manipulation

78. The timeline impossibilities in Defendant's reports cannot be explained by mistake:

- Claiming to identify Plaintiff before searching him—strategically reordering events to create apparent constitutional compliance
- Claiming to observe "hiding" when no hiding occured
- Claiming weapon fears before initiating search, yet opening door casually and later leaving cuffed hands over alleged weapon location for 25 seconds
- Claiming to see a weapon-suggesting bulge before it was visible (see ¶26)
- Creating post-arrest audio about "hiding in underwear" never observed

79. The specificity of Defendant's falsifications shows a calculated pattern of constitutional circumvention:

- Chose "left hand hiding" to match movements visible during the pat-down search, then backdated this claim to the initial wallet search period
- In reports, defendant placed weapon fear at exact moment needed to justify search
- Created hiding narrative to explain pre-positioned items and justify unsupported weapon fears
- Used legally significant terms ("blading," "weapons," "hiding") known to survive judicial review

Each falsification and misrepresentation cured a specific constitutional defect in his conduct

80. Additional facts regarding Defendant's conduct and statements:
- Defendant never amended or corrected his reports, even after bodycam footage became available and contradicted his written account
- The phrase "weapon" or "safety" appears nowhere in Defendant's statements during the entire encounter but appears multiple times in his written report
- Defendant used "boilerplate" or legally significant language in his report (e.g., "blading," "hiding," "officer safety") that is commonly used to justify searches and seizures, despite those terms not reflecting the actual encounter as shown on video
- Defendant introduced new justifications and narrative elements (such as "hiding in underwear" or specific weapon fears) only after the stop had concluded, and only in post-arrest statements and reports, not contemporaneously
- Defendant failed to take standard officer safety precautions (such as calling for backup or securing Plaintiff's hands away from the alleged weapon location), which is inconsistent with genuine fear but consistent with retroactive justification

- The timing and content of Defendant's statements shifted between the encounter, post-arrest audio, and written report, with each version curing specific constitutional defects in the prior version.

## Evidence of Institutionalized Methods and Recurrent Conduct

81. Defendant's use of sophisticated falsification and misrepresentation techniques reflects more than isolated error or inexperience; it demonstrates either repeated personal practice or institutional training and tolerance.

82. In this stop, Defendant employed a multi-layered system of deception, including:

- Downward oriented camera, creating create blind spots
- Non-specific questioning during blind spot periods
- Manipulating the timeline of events in his reports to justify otherwise unlawful actions
- Using leading questions post-arrest to create a false audio record supporting his written narrative
- Reports using boilerplate and court-friendly terminology that did not reflect the actual encounter as captured on video

83. At approximately 19:00, when Plaintiff objected to the vehicle search, Defendant stated: "I wouldn't be violating your rights just to violate them. Okay, why would I want to lose my job to go search your car?"

84. Defendant's confidence in executing these techniques—even while acknowledging the seriousness of constitutional violations—strongly suggests that he has practiced and refined these methods over multiple prior encounters. Such assured execution is consistent with an officer who has repeatedly employed similar tactics, indicating that these methods are not isolated to this incident but represent Defendant's standard operating procedure, developed through experience and/or institutional tolerance within DPS.

85. This statement reveals:

  - Defendant knew violating rights was a terminable offense

  - Defendant received training on constitutional requirements

  - Despite this knowledge, Defendant proceeded to violate rights

  - DPS's actual practice differs from stated policy

86. The practiced execution of multiple sophisticated techniques in a single stop strongly suggests that such methods are not accidental or unique to this incident. Rather, they may result from formal or informal training, an institutional culture that shares and refines such techniques, or from Defendant's own repeated use and refinement of these methods in prior stops.

87. DPS's failure to detect obvious falsifications through supervisory review demonstrates either:

  - Indifference to false reporting, or

  - Complicity in concealment techniques, or

- That Defendant's methods were so practiced and sophisticated that they were able to evade detection by even diligent supervisors—suggesting a personal pattern of deception or advanced skill in fabricating evidence

88. Upon information and belief, discovery will reveal that Defendant has used similar concealment, fabrication, falsification, misrepresentation, report manipulation, and escalation techniques in other traffic stops and arrests. The practiced and confident execution of these methods in this case strongly suggests that they are part of his regular approach to traffic enforcement, rather than an isolated incident. Accordingly, Plaintiff seeks discovery of prior bodycam footage, reports, and complaints involving Defendant to establish the frequency and pattern of such conduct.

88a. Plaintiff seeks discovery of prior similar acts by Defendant Pedroza specifically to obtain evidence admissible under Federal Rule of Evidence 404(b), including to show intent, knowledge, plan, and absence of mistake in the conduct alleged herein. The repeated and sophisticated nature of Defendant's techniques—camera manipulation, contradictory commands, post-hoc justifications, and fabricated observations—are not isolated or accidental, but evidence of a deliberate plan and knowledge of how to evade constitutional scrutiny. Such evidence is directly relevant and admissible under Rule 404(b) to prove intent, knowledge, and absence of mistake.

**P. Basis for Rule 404(b) Pattern Evidence Discovery**

89. Plaintiff sets forth the following facts and allegations to establish a good-faith basis for discovery into whether Defendant's conduct in this case reflects a broader pattern or practice—by Defendant individually or within DPS as an institution. These facts also support inferences of intent, knowledge, and absence of mistake, and justify discovery of other stops and arrests conducted by Defendant, as well as relevant training, supervision, and disciplinary records.

90. The sophistication and specificity of Defendant's techniques demonstrate they were not mistakes or accidents:

91. Defendant's conduct followed a precise sequence: (1) downward facing camera creating blind spots, (2) vague questioning during the blind spot period, (3) post-hoc insertion of "hiding" observations into reports, (4) strategic use of legal terminology ("blading," "officer safety") absent from the actual encounter, and (5) post-arrest audio creation to support the false narrative.

92. The execution of these techniques required advanced knowledge of: (a) how to position bodycams to create unverifiable claims, (b) which legal phrases survive judicial scrutiny, (c) how to sequence events in reports to appear constitutional, and (d) how to create supporting evidence after the fact.

93. Defendant's immediate and practiced execution of these techniques, without hesitation or uncertainty, strongly suggests that he has used similar methods in prior stops and is familiar with their effectiveness in avoiding detection or discipline.

94. Upon information and belief, discovery will reveal whether Defendant has employed similar techniques in other traffic stops, including: positioning bodycams to obscure initial interactions, claiming observations during unrecorded periods, using contradictory commands to escalate encounters, and creating post-hoc justifications in reports that differ from contemporaneous statements.

95. The specific nature of Defendant's fabrications—particularly his knowledge that "weapon fears" would justify an otherwise illegal search—demonstrates understanding of Fourth Amendment case law and deliberate exploitation of legal standards rather than good-faith mistakes.

96. Defendant's willingness to commit multiple acts of perjury in official documents, despite knowing that rights violations could cost him his job, suggests confidence that his methods would not be detected or punished.

97. Plaintiff alleges on information and belief that Defendant's use of these techniques is not isolated to this incident, but reflects a broader pattern or practice of similar conduct in other traffic stops, the existence and scope of which Plaintiff seeks to determine through discovery—specifically, by obtaining prior bodycam footage, reports, and complaints involving Defendant.

98. Upon information and belief, only Defendant and DPS possess the bodycam footage, reports, and complaints necessary to confirm or disprove the existence of this pattern. Plaintiff therefore seeks discovery of all prior bodycam footage, reports, and complaints involving Defendant's stops and arrests, to determine whether these methods are part of his regular practice and to establish a pattern of similar conduct admissible under Rule 404(b). Plaintiff is willing to accept reasonable protective measures, including redaction of personal information and limitations to similar types of stops, to address any privacy or proportionality concerns.

98. 98a. Plaintiff alleges on information and belief that Defendant's use of these techniques reflects a pattern admissible under Rule 404(b) to prove knowledge, intent, and absence of mistake, and that discovery of such prior acts is necessary and appropriate for these purposes.

## IV. FIRST CLAIM: 42 U.S.C. § 1983 – FOURTH AMENDMENT VIOLATIONS

99. Plaintiff incorporates the preceding paragraphs by reference.

100. At all relevant times, Defendant acted under color of state law as a Texas State Trooper.

101. The Fourth Amendment prohibits unreasonable searches and seizures and requires probable cause for arrests.

102. Defendant violated clearly established Fourth Amendment law by:

## A. Unlawful Extension of Traffic Stop

103. A traffic stop may not be extended beyond the time reasonably required to complete its purpose without reasonable suspicion of criminal activity.

104. The purpose of Defendant's stop—obtaining identification for a speeding citation—was completed at 2:48 when Plaintiff produced his license.

105. Defendant unlawfully extended the stop by:

- Walking to the driver's side instead of processing the license

- Opening the door without permission or reasonable suspicion

- Initiating investigation into legal Delta-8 products

- Ordering Plaintiff from the vehicle absent safety concerns

106. Defendant lacked reasonable suspicion because:

- Plaintiff's wallet search was entirely legitimate

- No furtive movements occurred (proven by video)

- Delta-8 THC is legal and cannot support reasonable suspicion

- Defendant's relaxed demeanor contradicted any claimed suspicion

## B. Unlawful Search Without Probable Cause

107. The Fourth Amendment requires probable cause for warrantless searches absent valid exceptions.

108. Defendant conducted warrantless searches of:

- Plaintiff's person (pockets and pat-down)

- Plaintiff's intimate areas (reaching into underwear)

- Plaintiff's vehicle and belongings

109. No valid exception applied:

- No consent (Plaintiff explicitly objected)

- No probable cause (only legal items observed)

- No exigent circumstances (Defendant's behavior disproved urgency)

- No valid search incident to arrest (arrest itself was unlawful)

110. Defendant's claimed justifications were fabricated:

- "Hiding" behavior never occurred

- "Weapon" concern contradicted by 25-second delay

- Observable facts showed only legal activity

## C. False Arrest Without Probable Cause

111. Probable cause requires facts and circumstances sufficient for a reasonable officer to believe a crime has been committed.

112. At the time of arrest, Defendant lacked probable cause because:

- He observed only legal Delta-8 THC products

- Plaintiff claimed to have prescriptions and attempted to provide verification

- Defendant actively prevented prescription verification

- The mere possession of pills in blister packs, without more, does not establish they are illegal

- No field test or other verification confirmed any substance was actually illegal

- Finding one properly prescribed medication (Nardil) corroborated Plaintiff's claims about having prescriptions

113. Defendant arrested Plaintiff based on:

- Fabricated observations of "hiding" unsupported by available video evidence and officer's own statements

- "Weapon" concerns contradicted by his own conduct

- Deliberate prevention of prescription verification

- Assumptions about legality without investigation

- The unlawful extension of the traffic stop itself

114. A reasonable officer who prevents a suspect from verifying prescriptions cannot then rely on the absence of verification as probable cause for arrest.

115. No reasonable officer could have believed probable cause existed based on the actual facts known to Defendant.

116. These violations of clearly established law were objectively unreasonable and undertaken with indifference to Plaintiff's constitutional rights.

117. Defendant's actions, including the use of handcuffs and physical restraint, constituted an unreasonable seizure under the Fourth Amendment, as they were not supported by probable cause or any legitimate officer safety concern but were instead the product of fabricated justifications and contradictory commands.

118. The systematic nature of Defendant's violations—employing multiple sophisticated techniques in coordinated fashion—demonstrates these were not isolated mistakes but deliberate choices reflecting a practiced methodology.

119. Plaintiff further alleges that Defendant's conduct is part of a pattern or practice of similar constitutional violations, and requests discovery of prior complaints, bodycam footage, and disciplinary records relevant to Defendant's intent, knowledge, or absence of mistake.

120. Defendant's conduct, as set forth above, violated Plaintiff's clearly established rights under the Fourth Amendment to the United States Constitution. No reasonable officer could have believed that such conduct was lawful, and Defendant is therefore not entitled to qualified immunity.

## V. SECOND CLAIM: 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT DUE PROCESS VIOLATIONS

121. Plaintiff incorporates the preceding paragraphs by reference.

122. The Fourteenth Amendment protects against deprivation of liberty without due process of law.

123. The fabrication of evidence by law enforcement violates due process when it is used to deprive a person of liberty.

### A. Fabrication of Evidence

124. Defendant fabricated evidence by:
- Falsely claiming to observe "hiding something with his left hand"
- Falsely claiming to observe a weapon-suggesting "bulge" before it was visible
- Creating false temporal sequences in official reports
- Manufacturing post-arrest audio "evidence" about underwear concealment

125. These fabrications were not mistakes but strategic lies:
- Video demonstrates the impossibility of claimed observations
- Timeline discrepancies span minutes, and are sequentially consequential
- Multiple false statements create consistent false narrative

- Post-arrest audio shows consciousness of guilt

**B. Use of Fabricated Evidence to Deprive Liberty**

126. Defendant used his fabricated evidence to:

- Submit false probable cause affidavit

- Initiate criminal prosecution

- Cause 8-day incarceration

- Force medication withdrawal without medical supervision

127. But for Defendant's fabrications, Plaintiff would not have been:

- Arrested

- Charged

- Incarcerated

- Deprived of necessary medication

128. The causal link between fabrication and liberty deprivation is direct and undeniable.

**C. Conscience-Shocking Behavior**

129. Defendant's conduct shocks the conscience because:

- He swore false statements under penalty of perjury

- He created elaborate deceptions to frame an innocent citizen

- He used his position of trust to manufacture crimes

- He showed complete indifference to the harm caused

130. This was not mere negligence but intentional misconduct designed to deprive Plaintiff of liberty through false evidence.

131. The methodical nature of Defendant's fabrications—each precisely crafted to cure a specific legal deficiency—demonstrates this was not his first attempt at manufacturing probable cause through false evidence.

132. Plaintiff further alleges that Defendant's conduct is part of a pattern or practice of similar constitutional violations, and requests discovery of prior complaints, bodycam footage, and disciplinary records relevant to Defendant's intent, knowledge, or absence of mistake.

133. Plaintiff alleges that the conduct described above violated rights that were clearly established at the time of the incident, such that no reasonable officer in Defendant's position could have believed his actions were lawful under the circumstances presented.