Civil Action No. 7:25-cv-00393

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

## MCALLEN DIVISION

**ANGEL ADALBERTO ALANIS**,

     Plaintiff,                                  Civil Action No. 7:25-cv-00393

v.

**TROOPER PABLO PEDROZA, et al.**,

     Defendants.

## PLAINTIFF'S NOTICE OF FILING SECOND AMENDED COMPLAINT AS OF RIGHT IN RESPONSE TO DEFENDANT PEDROZA'S MOTION TO DISMISS (FED. R. CIV. P. 15(a)(1)(B)) AND REQUEST FOR ISSUANCE OF SUMMONSES

Plaintiff, proceeding *pro se* and *in forma pauperis*, files this Second Amended Complaint **as of right** pursuant to Federal Rule of Civil Procedure 15(a)(1)(B). Defendant Trooper Pablo Pedroza served a Motion to Dismiss under Rule 12(b)(6) on the First Amended Complaint. This Second Amended Complaint is filed within 21 days of service of that motion and therefore moots the pending Motion to Dismiss.

Attached are:

- Second Amended Complaint;

- Proposed Summonses for the newly added defendants (Alberto Moreno, John Doe Assistant District Attorney, and Toribio Palacios in his official capacity); and

- Completed USM-285 forms for the new defendants.

1

Civil Action No. 7:25-cv-00393

Pursuant to the Court's prior order granting *in forma pauperis* status and directing service by the U.S. Marshal, Plaintiff respectfully requests that the Clerk (1) issue the attached proposed summonses and (2) deliver the Second Amended Complaint, issued summonses, and USM-285 forms to the U.S. Marshal for prompt service on the newly added defendants.

Respectfully submitted this 21st day of November, 2025.

**Angel Adalberto Alanis**

1107 N. Bethel St.

Roma, Texas 78584

(956) 379-8874

a4alaniz@gmail.com

*Pro Se Plaintiff*

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

# UNITED STATES DISTRICT COURT

for the

Southern District of Texas

McAllen Division

CLERK U.S. DISTRICT COURT
RECEIVED
NOV 2 1 2025
SOUTHERN DIST. OF TEXAS
McALLEN, TEXAS

Angel Adalberto Alanis Jr.

*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.*
*If the names of all the plaintiffs cannot fit in the space above,*
*please write "see attached" in the space and attach an additional*
*page with the full list of names.)*

–v–

Trooper Pablo Pedroza,
Supervisor Alberto Moreno,
John Doe, Assistant District Attorney,
Toribio Palacios, District Attorney

*Defendant(s)*
*(Write the full name of each defendant who is being sued. If the*
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names. Do not include addresses here.)*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.     7:25-cv-00393

*(to be filled in by the Clerk's Office)*

Jury Trial: *(check one)*   ☑ Yes   ☐ No

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

(Non-Prisoner Complaint)

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

## I.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Angel Adalberto Alanis Jr. |
| Address | 1107 N Bethel St. |

| | | |
|---|---|---|
| Roma | TX | 78584 |
| *City* | *State* | *Zip Code* |

| | |
|---|---|
| County | Starr |
| Telephone Number | (956) 379-8874 |
| E-Mail Address | a4alaniz@gmail.com |

### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Pablo Pedroza |
| Job or Title *(if known)* | Texas Department of Public Safety (DPS) State Trooper |
| Address | 1414 N Bicentennial |

| | | |
|---|---|---|
| McAllen | TX | 78501 |
| *City* | *State* | *Zip Code* |

| | |
|---|---|
| County | Hidalgo |
| Telephone Number | (956) 565-7544 |
| E-Mail Address *(if known)* | |

[✔] Individual capacity     [ ] Official capacity

Defendant No. 2

| | |
|---|---|
| Name | Alberto Moreno |
| Job or Title *(if known)* | Texas Department of Public Safety (DPS) State Trooper |
| Address | 1414 N Bicentennial |

| | | |
|---|---|---|
| McAllen | TX | 78501 |
| *City* | *State* | *Zip Code* |

| | |
|---|---|
| County | Hidalgo |
| Telephone Number | (956) 565-7544 |
| E-Mail Address *(if known)* | |

[✔] Individual capacity     [ ] Official capacity

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

Defendant No. 3

| | |
|---|---|
| Name | John Doe |
| Job or Title *(if known)* | Assistant District Attorney for the Hidalgo County DA's Office |
| Address | 100 E. Cano St. |
| | Edinburg | TX | 78539 |
| | *City* | *State* | *Zip Code* |
| County | Hidalgo |
| Telephone Number | (956) 292-7600 |
| E-Mail Address *(if known)* | |

☑ Individual capacity   ☐ Official capacity

Defendant No. 4

| | |
|---|---|
| Name | Toribio Palacios |
| Job or Title *(if known)* | District Attorney for Hidalgo County, Texas |
| Address | 100 E. Cano St. |
| | Edinburg | TX | 78539 |
| | *City* | *State* | *Zip Code* |
| County | Hidalgo |
| Telephone Number | (956) 292-7600 |
| E-Mail Address *(if known)* | |

☐ Individual capacity   ☑ Official capacity

## II.   Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A.   Are you bringing suit against *(check all that apply)*:

☐ Federal officials (a *Bivens* claim)

☑ State or local officials (a § 1983 claim)

B.   Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials? Fourth Amendment: Rights against unreasonable search and seizure, false arrest, unlawful pretrial detention, and malicious prosecution (including violations caused by municipal customs/policies). Fourteenth Amendment: Right to due process and freedom from deprivation of liberty through the fabrication of evidence.

C.   Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

N/A

D.  Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.
See "ATTACHMENT: COLOR OF STATE LAW EXPLANATION"

## III.  Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.  Where did the events giving rise to your claim(s) occur?
The events giving rise to this lawsuit occurred in Mission, Texas (Hidalgo County), and at the Hidalgo

County Jail in Edinburg, Texas.

B.  What date and approximate time did the events giving rise to your claim(s) occur?
"January 20, 2023 (approx. 10:00PM) through February 1, 2024. Specific dates include: Jan 20–30, 2023 (Unlawful Detention); August 31, 2023 (Filing of False Charges); and February 1, 2024 (Dismissal of Charges)."

C.  What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*
See "ATTACHMENT: CONTINUATION OF SECTION III" attached. ¶1-¶252

## IV.    Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.
See "Continuation of Section IV" attached ¶253-¶268

## V.    Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.

See "Continuation of Section V" attached ¶269-¶280

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

## VI.   Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.   For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:        11/21/2025

Signature of Plaintiff

Printed Name of Plaintiff        Angel Adalberto Alanis Jr.

### B.   For Attorneys

Date of signing:

Signature of Attorney
Printed Name of Attorney
Bar Number
Name of Law Firm
Address

| | City | State | Zip Code |

Telephone Number
E-mail Address

Color of State Law - Attachment

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

MCALLEN DIVISION

**ANGEL ADALBERTO ALANIS**,

Plaintiff,

v.

**TROOPER PABLO PEDROZA, et al.**,

Defendants.

Civil Action No. 7:25-cv-00393

## ATTACHMENT: COLOR OF STATE LAW EXPLANATION

### (42 U.S.C. § 1983)

Section 1983 requires defendants to have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." Each defendant in this action acted under color of state law as follows:

**Trooper Pablo Pedroza:** Defendant Pedroza is a trooper employed by the Texas Department of Public Safety. He acted under color of state law on January 20, 2023, when he initiated a traffic stop, extended the detention, conducted searches, arrested Plaintiff, and prepared official offense reports while on duty, in uniform, exercising authority granted by his position as a state trooper, and performing official law-enforcement duties pursuant to Texas statutes and DPS policy.

**Supervisor Alberto Moreno:** Defendant Moreno is a supervisory trooper with the Texas Department of Public Safety. He acted under color of state law when he affirmatively participated in the

1

seizure by personally reviewing, approving, and authorizing Trooper Pedroza's fabricated arrest report in this case and at least eight substantially similar reports, while exercising supervisory authority granted by Texas law and DPS policy.

**John Doe, Assistant District Attorney:** Defendant John Doe is an assistant district attorney employed by the Hidalgo County District Attorney's Office. He acted under color of state law on or about August 31, 2023, when he reviewed Trooper Pedroza's fabricated police reports, performed investigatory functions by incorporating those reports into charging documents, and filed felony charges for possession of loperamide (an over-the-counter substance) while exercising prosecutorial authority granted by Texas law.

**Toribio Palacios, District Attorney (Official Capacity):** Defendant Palacios is sued in his official capacity as the elected District Attorney for Hidalgo County, Texas. The official-capacity claim is equivalent to a suit against the Hidalgo County District Attorney's Office itself for the customs, policies, and practices maintained under his final policymaking authority, including blind filing of police reports without video review, failure to track officer credibility patterns, and charging non-controlled substances as felonies.

All individual Defendants acted under color of Texas law by invoking the power and authority of their offices as law-enforcement officers and prosecutors, including the authority to stop, detain, search, arrest, interrogate, prepare sworn reports, approve reports, screen evidence, and initiate criminal charges.

2

Civil Action No. 7:25-cv-00393

## SECOND AMENDED COMPLAINT

### (42 U.S.C. § 1983)

## ATTACHMENT: CONTINUATION OF SECTION III

ANGEL ADALBERTO ALANIS,

    Plaintiff,                                    Civil Action No. 7:25-cv-00393

v.

TROOPER PABLO PEDROZA,

in his individual capacity,

SUPERVISOR ALBERTO MORENO,

in his individual capacity,

JOHN DOE, Assistant District Attorney

for the Hidalgo County District

Attorney's Office,

in his individual capacity,

Toribio PALACIOS, District Attorney

for Hidalgo County, Texas,

in his official capacity,

    Defendants.

## SECOND AMENDED COMPLAINT

### (42 U.S.C. § 1983)

Civil Action No. 7:25-cv-00393

## NATURE OF ACTION

This is a civil rights action under 42 U.S.C. § 1983 arising from Defendant Trooper Pablo Pedroza's systematic fabrication of evidence to manufacture probable cause for an unlawful traffic stop extension, warrantless searches, false arrest, and unlawful pretrial detention of Plaintiff Angel Alanis on January 20, 2023. Pedroza's investigative report claims Plaintiff made "hiding movements" during both the pre-search period and the out-of-vehicle search phase. The pre-search "hiding" claims are proven false by: (1) Pedroza's bodycam was pre-angled downward, preventing observation of upper body movements during the period he claims to have observed hiding; (2) Pedroza's 36:22 admission that his "hiding" claims actually referred to the out-of-vehicle search phase, not any pre-search observation; and (3) physical impossibilities including claimed observation of a bulge in Plaintiff's back pocket from the opposite side of a seated driver. The out-of-vehicle "hiding" claims are proven false by synchronized dashcam footage showing Plaintiff's hands remained visible and compliant throughout—directly contradicting Pedroza's sworn statements.

These fabrications violated Plaintiff's clearly established Fourth and Fourteenth Amendment rights, resulting in eleven days of incarceration with forced medication withdrawal and a year-long prosecution dismissed on February 1, 2024. Defendant Supervisor Alberto Moreno directly participated in and enabled Pedroza's systematic violations by personally approving Pedroza's fabricated report in Plaintiff's case and eight substantially similar reports within thirteen months , despite institutional notice from a seven-year pattern spanning twenty-three cases (2017-2023) that included multiple dismissals with explicit judicial findings of lack of probable cause and constitutional violations , demonstrating deliberate indifference to clearly established rights.

Defendants John Doe (Assistant District Attorney, individual capacity) and Toribio Palacios (District Attorney, official capacity) initiated and prolonged malicious prosecution by filing criminal charges more than seven months after Plaintiff's release from detention, without conducting basic verification. John Doe charged Plaintiff with possession of loperamide—an over-the-counter anti-diarrheal medication available at any pharmacy—as if it were a controlled substance, despite laboratory confirmation of its identity and readily accessible statutes proving it carries no criminal penalties. Between 2017 and 2024, the DA's office prosecuted twenty-three Pedroza cases. By August 2023 when John Doe filed charges against

Plaintiff, the office had already prosecuted twenty Pedroza cases over six years and declined to prosecute two additional Pedroza arrests. This institutional knowledge included multiple dismissals, suppression hearings, and decisions not to prosecute, yet the office maintained customs of filing charges without video review, without officer credibility tracking, without cross-case pattern analysis, and without verifying that charged substances are actually controlled under law.

## I. JURISDICTION AND VENUE

1. This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a), as it arises under the Constitution and laws of the United States, specifically 42 U.S.C. § 1983.

2. Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in Hidalgo County, Texas, within the Southern District of Texas, and Defendants were acting under color of state law in this district.

## II. PARTIES

3. Plaintiff Angel Alanis is a resident of Starr County, Texas. At all relevant times, Plaintiff was a civilian motorist lawfully operating a vehicle on public roads.

4. Defendant Trooper Pablo Pedroza is a Texas Department of Public Safety Trooper. At all relevant times, Defendant was acting under color of state law within the course and scope of his employment. He is sued in his individual capacity.

5. Defendant Supervisor Alberto Moreno is a supervisor with the Texas Department of Public Safety. At all relevant times, Defendant was acting under color of state law within the course and scope of his employment. He approved Pedroza's arrest report in this case and at least seven other similar patterned arrests. He is sued in his individual capacity.

6. Defendant John Doe, Assistant District Attorney for the Hidalgo County District Attorney's Office, is and was at all relevant times an assistant district attorney employed by Hidalgo County, acting under color of state law. On or around August 31, 2023, he performed investigatory functions by reviewing and incorporating fabricated police reports into charging documents without independent

verification despite the office's institutional knowledge of Pedroza's systematic pattern from prior prosecutions. He is sued in his individual capacity for damages.

7. Defendant Toribio Palacios is the elected District Attorney for Hidalgo County, Texas. He is sued in his official capacity for damages and prospective injunctive relief arising from customs, policies, and practices maintained by the Hidalgo County District Attorney's Office under his supervision and control.

## III. TIMELINESS OF ACTION

8. Plaintiff's malicious prosecution claims (Claims 5 and 8) accrued on February 1, 2024, when all charges were dismissed. Plaintiff filed this action on August 8, 2025, well within the two-year statute of limitations.

9. Plaintiff's Fourth Amendment claims (Claims 1, 2, 3), fabrication of evidence claim (Claim 4), supervisory liability claim (Claim 6), and municipal liability claim (Claim 7) may have accrued when the underlying violations occurred in January 2023. To the extent these claims accrued more than two years before this action was filed, the statute of limitations was tolled by Defendant Pedroza's fraudulent concealment as detailed in Section V below.

10. Plaintiff discovered the concealed violations on June 20, 2025, and filed this action on August 8, 2025, demonstrating reasonable diligence. All claims are timely under fraudulent concealment.

## IV. FACTUAL ALLEGATIONS

### A. The Traffic Stop and Arrest (January 20, 2023)

11. On January 20, 2023 Defendant Trooper Pablo Pedroza initiated a traffic stop of Plaintiff Angel Alanis's vehicle in Hidalgo County, Texas.

12. Defendant Pedroza's dashcam recorded from behind and left of Plaintiff's vehicle. His bodycam was pre-angled downward at his khakis before recording began, capturing only his lower body—an affirmative act that obscured Plaintiff's upper-body movements and shielded Pedroza's subsequent fabrications from visual rebuttal.

4

13. At approximately 00:52, while standing behind the rear passenger tire of Plaintiff's vehicle, Defendant Pedroza tapped on the rear passenger window and stated "lower the back window please, baja la ventana." A vehicle engine roared past on the adjacent highway as he spoke. Additionally, historical weather data confirms wind gusts between 18 and 31 mph were occurring at the time of the stop—a condition corroborated by Defendant's own bodycam footage, which captures the shadow of a flag waving violently against the ground from approximately 00:50 through 02:55. However, the primary cause of the misunderstanding was Defendant Pedroza's physical positioning relative to the driver. By issuing commands from the rear passenger blind spot (diagonally opposite the Plaintiff), the source of the voice was acoustically disorienting. This positioning, combined with the overwhelming highway noise and wind, prevented Plaintiff from distinguishing which specific rear window was being requested. Consequently, Plaintiff lowered the rear driver's side window in an honest attempt to comply; this error was a result of the confusing acoustics of the officer's location and environmental factors, not nervousness or evasion.

14. Once Pedroza stepped forward and repeated the command louder, Plaintiff lowered the rear passenger window.

15. From his position behind the rear passenger tire, Defendant Pedroza could only observe that the window beside him remained raised—not that Plaintiff had lowered the opposite window.

16. Plaintiff initially remained silent, exercising his constitutional rights. Upon sensing confrontation, Plaintiff relented and began responding to Defendant Pedroza's questions.

17. Defendant Pedroza approached the passenger side and requested Plaintiff's license and insurance. Plaintiff immediately began searching for his wallet, stating three times that he was looking for it (at 1:58, 2:33, and 2:43).

18. During this search, Defendant Pedroza stated Plaintiff was "throwing stuff" and asked why Plaintiff had "that USB between your legs." When Defendant Pedroza continued questioning if Plaintiff was "sitting on anything" Plaintiff responded: "No, but I am looking for my wallet." The bodycam, pre-angled at Defendant Pedroza's khakis, captured none of Plaintiff's movements, thereby preventing verification of Defendant Pedroza's statements.

5

Civil Action No. 7:25-cv-00393

19. While Plaintiff searched, Defendant Pedroza stood relaxed with his left leg bent forward, leaning against the vehicle for over one minute asking questions about Plaintiff's mother and phone contacts.

20. At approximately 02:02, Defendant Pedroza requested Plaintiff "turn off your radio."

21. At 2:48, Plaintiff located and produced his driver's license, stating "Oh, here it is!" This completed the traffic stop's mission.

22. Defendant Pedroza's investigative report states Plaintiff "threw [something] quickly into the center console under the radio." The vehicle search would later reveal no contraband in the center console.

23. Defendant Pedroza's investigative report states that immediately before opening the door, Plaintiff's movements "made Trooper Pedroza nervous that he may have a weapon he was trying to conceal."

24. At 3:02, immediately prior to breaching the vehicle, Defendant Pedroza possessed no specific, articulable facts to support a reasonable suspicion of criminal activity. Having observed no contraband, detected no odor of narcotics, and witnessed no weapon, and having engineered the conditions for any perceived "non-compliance" through the environmental interference of high winds and highway noise, Defendant lacked the requisite objective basis to extend the seizure beyond the mission of the traffic ticket.

25. At 3:02, despite this purported fear, Defendant Pedroza opened Plaintiff's vehicle door unannounced and without warning.

26. This unannounced breach of the vehicle's interior constituted a warrantless search that preceded any observation of contents. The constitutional violation was complete the moment Defendant Pedroza broke the plane of the vehicle door, rendering any subsequent "plain view" observation—including the Delta-8 product seen only after the breach—fruit of the poisonous tree and legally void as justification for further detention.

27. Upon opening the door, Defendant Pedroza observed only a legal Delta-8 THC product on the floorboard. Delta-8 THC was legal in Texas at this time.

28. At 3:31, Defendant Pedroza ordered Plaintiff out of the vehicle. From this point forward, the dashcam captured Plaintiff's entire body and all hand movements.

29. At 3:46, Defendant Pedroza commanded Plaintiff to "turn around that way." Plaintiff shifted his torso to the left as commanded. Defendant Pedroza's investigative report characterizes Plaintiff's movement as "blading his body away from Trooper Pedroza."

30. At 3:50, despite claiming concern about weapons, Defendant Pedroza ordered Plaintiff to "empty your pockets"—requiring Plaintiff to reach into his own pockets where any weapon would be located.

31. As Plaintiff began reaching for his pockets, Defendant Pedroza abruptly commanded: "uh uh uh, get your hand out!"

32. Defendant Pedroza directed Plaintiff to empty his right pocket first. After Plaintiff complied, he logically proceeded to his left pocket when Defendant Pedroza again commanded: "no no no, get your hand out!" (approximately 4:10). Dashcam footage shows Plaintiff's left hand remained visible and elevated after this command—directly contradicting Defendant Pedroza's written claim that Plaintiff "kept moving his left hand behind him."

33. Plaintiff complied with these commands solely in submission to Defendant Pedroza's show of authority. The loose medication packets produced were completely concealed within Plaintiff's clothing and were discovered only after and as a direct result of this unlawful seizure and coerced search. But for the fabricated 'weapon fear' and the resulting command to empty his pockets, these items would have remained undiscovered, and thus could not serve as independent probable cause to justify the arrest.

34. At 4:46, after Plaintiff was compelled to produce the pills from his right pocket, Defendant Pedroza asked about prescriptions. When Plaintiff moved toward his vehicle to retrieve them from the glove compartment, Defendant Pedroza commanded: "no no no, stay over here."

35. At 5:16, Defendant Pedroza ordered Plaintiff to turn so he could search Plaintiff's other pocket. Plaintiff complied.

36. At 5:30, Defendant Pedroza physically palpated Plaintiff's back left pocket with his hand while shining his flashlight on it, grasping and shaking the contents.

37. After confirming the baggie contained no weapon through physical touch, Defendant Pedroza or-
dered Plaintiff to "take that out." The item was located in Plaintiff's waistband behind the back
pocket fabric. At 5:32, Plaintiff complied by reaching into his waistband as commanded—the only
way to remove an item from that location.

38. As Plaintiff followed this direct order, Defendant Pedroza placed him in handcuffs. Defendant
Pedroza's investigative report characterizes this moment in two ways: First, it claims Plaintiff "was
attempting to push what he had away from view" and "made that movement to hide what he had
in his pants"—when video proves Plaintiff was obeying Defendant Pedroza's command. Second, it
states Defendant Pedroza placed Plaintiff in handcuffs "due to not knowing if Alanis had any sort of
weapons"—despite having just physically palpated the soft baggie moments earlier.

39. Immediately after handcuffing Plaintiff, Defendant Pedroza asked: "why were you reaching UP here
when I asked you to pull out what you had in your pocket?" Defendant Pedroza had just commanded
Plaintiff to "take that out". This verbal mischaracterization of commanded compliance as suspicious
voluntary conduct occurred seconds after Plaintiff followed the direct order.

40. At 5:48, Defendant Pedroza handcuffed Plaintiff without probable cause. After handcuffing, Plain-
tiff's hands remained positioned over the back left pocket for 25 seconds (5:53 to 6:18).

41. Only after the 25 seconds elapsed, with Plaintiff's hands directly over the back pocket area with the
"bulge," did Defendant Pedroza begin securing that area.

42. At bodycam timestamp 8:55, while handcuffed and standing in front of the patrol car, Plaintiff—overwhelmed
by the rapid-fire contradictory commands and genuinely believing he had failed to comply properly
and had caused the situation to escalate—stated to Defendant Pedroza, "I'm sorry."

43. Throughout the encounter, Defendant Pedroza never called backup, opened the door unannounced,
ordered Plaintiff to empty his own pockets, and later transported Plaintiff to jail in the front passen-
ger seat.

44. The only contraband discovered was already on Plaintiff's person: fourteen blister packages of pills
and multiple loose pill baggies. Additional pills were later discovered in Plaintiff's shoes during

Civil Action No. 7:25-cv-00393

booking. No contraband was located anywhere in the vehicle.

45. Each blister package was approximately the size of a pack of Dentyne Ice gum and made of reflective metallic material that produces noise when handled; no such noise or handling was observed by Defendant Pedroza or recorded on the bodycam during the supposed hiding movements.

46. While Plaintiff was searching for his wallet, Defendant Pedroza did not ask questions indicating he observed packages or pill baggies being moved; instead he asked about a USB device and whether Plaintiff was sitting on anything.

47. Additional facts regarding the wallet-searching period: (a) his report confirms that the center console and glovebox were empty, eliminating these places as sources from which any of the packages could have come from; (b) despite claiming to observe "hiding" movements, he never saw any of the 14 reflective packages later found on Plaintiff's person in plain view or anywhere in the car during the encounter or even after he searched the vehicle; and (c) he failed to ask about or mention observing specific reflective packages or baggies during the alleged "hiding."

48. Throughout the entire pre-search period—including the wallet-searching period when Defendant Pedroza claims he observed "hiding" movements—his bodycam did not capture Plaintiff's upper body or hand movements.

49. Plaintiff was aware that he did not hide anything during the encounter, but was unaware that Defendant Pedroza would fabricate claims to the contrary or that such fabrications would be concealed through pre-angled downward facing bodycam or created via contradictory commands and compliance with those commands.

50. Defendant Pedroza falsely swore he "identified the driver" before conducting the search. Video evidence proves identification occurred only at 10:07, after Plaintiff was already handcuffed and in the patrol car.

51. Defendant Pedroza claimed he "noticed a bulge in the back pocket area" as probable cause while Plaintiff was seated in his car. However, the bulge was in Plaintiff's waistband beneath the left back pocket and Pedroza was positioned at the passenger window on the opposite side during the entire

9

pre-search period. The bulge was not visible to Pedroza until after Plaintiff exited the vehicle and the search had already began.

52. Defendant Pedroza stated Plaintiff had "prescription medication without a prescription," despite: (a) preventing Plaintiff from retrieving prescription documentation from the glove compartment at 4:46 when Plaintiff attempted to do so; and (b) finding prescribed Nardil in a CVS bag with a visible prescription label during the vehicle search.

53. Defendant Pedroza also claimed in his reports that Plaintiff hid what was already hidden, for example stating: "As Alanis made that movement to hide what he had in his pants."

54. Defendant Pedroza arrested Plaintiff and conducted searches, discovering items including prescription Nardil (for which Plaintiff had a valid prescription) and other personal items.

55. At approximately 36:07, Defendant Pedroza stated: "you had it in your pants," referring to the contraband.

56. While in the patrol car, at timestamp 36:22, Defendant Pedroza admitted his "hiding" claims referred to the out-of-vehicle search phase: "every time that you turned and I asked you, hey, let's check this side, you kept turning and one of your hands kept moving around." The phrases "turned," "check this side," and "kept turning" match the out-of-vehicle search beginning at 3:46, not any pre-search observation.

57. Dashcam footage directly contradicts Defendant Pedroza's "hiding" claims during the out-of-vehicle phase, showing Plaintiff's left hand either raised visibly away from his body or reaching into his pockets in compliance with Defendant's "take this out" commands.

## B. Real-Time Verbal Concealment in Patrol Car

58. In the patrol car, Defendant Pedroza repeatedly insisted Plaintiff had actively hidden contraband "from me" during the search, stating at least eleven times variations of: "you were hiding it from me," "you stuck them in there," and "you know what you were doing." When Plaintiff stated the contraband "was always there before the lights turned on," Defendant Pedroza ignored this and continued asserting Plaintiff concealed items during the search.

Civil Action No. 7:25-cv-00393

59. When Plaintiff explained he was searching for his wallet during the initial encounter, Defendant Pedroza manufactured a timeline claiming Plaintiff "stuck it in your pants and your underwear" while looking for the wallet. The contraband was in Plaintiff's underwear before the stop began.

60. At 36:07, Defendant Pedroza stated "you had it in your pants," acknowledging the pre-existing location. Minutes later at 36:46, he insisted: "you were concealing it, you were hiding it from me."

61. Defendant Pedroza also stated: "Why would I violate your rights just to violate them, do you think I want to lose my job?"

62. These repeated assertions characterized the pre-existing storage location as active concealment during the search and manufactured false timelines of Plaintiff's conduct. The persistent insistence that Plaintiff had "hidden" items "from" Defendant Pedroza during the search created the belief in Plaintiff that his arrest was justified by his conduct during the stop, preventing Plaintiff from recognizing that constitutional violations had occurred.

63. Defendant Pedroza's verbal justifications in the patrol car further attribute the alleged probable cause to conflicting timelines. Although Pedroza asserted Plaintiff hid items "while looking for your wallet," his unprompted description of the specific physical movements at 36:22—"every time that you turned... you kept turning and one of your hands kept moving around"—identifies actions that occurred only during the out-of-vehicle search phase.

64. Dashcam footage identifies these specific out-of-vehicle movements as compliance with officer commands. The "turning" was compliance with the order to "turn around." The "hand moving" was compliance with the order to "empty your pockets," which Pedroza immediately contradicted with the command "get your hand out."

65. By asserting that these compliant responses occurred "while looking for your wallet," Pedroza transposed the out-of-vehicle events into the unrecorded in-vehicle timeline. This utilized the unrecorded window to present lawful compliance as pre-stop suspicion shielded from video verification.

**C. Additional Facts**

66. During the intake and booking process at the Hidalgo County Jail, the combined physiological stress of the unlawful arrest, the panic attack suffered in the patrol car, and the onset of forced medication withdrawal caused Plaintiff to suffer a syncopal episode (fainting). Plaintiff collapsed and lost consciousness, requiring emergency transport to a local hospital for medical evaluation before he could be incarcerated.

67. Toxicology reports administered at the hospital that same night showed Plaintiff tested positive only for THC, consistent with legal Delta-8 usage, and negative for any of the prescription medications or other substances Pedroza charged as controlled (including benzodiazepines). This directly contradicts Pedroza's implications of recent ingestion from missing pills or foaming mouth.

68. Plaintiff was detained in jail from January 20, 2023 to January 30, 2023 (eleven days), forced to endure medication withdrawal from his prescribed Nardil without proper medical oversight.

69. All criminal charges against Plaintiff were dismissed on February 1, 2024 as part of a plea agreement in an unrelated case.

70. Defendant Pedroza's probable cause affidavit states he "noticed Alanis was hiding something with his left hand and pushing it behind the back pocket area." The affidavit does not specify whether this alleged conduct occurred before or after the search.

71. Defendant Pedroza's investigative report splits his "left hand hiding" claim across two time periods. First, he alleges that while searching for his wallet, Plaintiff "kept moving his left hand behind him." Second, during the out-of-vehicle search, he claims "Alanis's left hand kept moving to his back left side."

72. Defendant Pedroza makes no contemporaneous, pre-search mention of "hiding" at the time such movements allegedly occurred. All instances of "hiding" appear only post hoc.

**D. Pedroza's Systematic Pattern of Fabrication (2017-2025)**

**1. Relevance to Claims (Roadmap of Proof)**

73. Plaintiff pleads this pattern evidence to establish specific elements required to overcome immunity defenses and establish liability:

- **Notice to Defeat Qualified Immunity (Pedroza):** Judicial records show Pedroza received actual notice that his tactics were unconstitutional through specific suppressions (Grimaldo, Olivar) and dismissals (Olivar, Lopez). Continued use of these tactics after such notice constitutes a violation of clearly established law.

- **Evidence of Malice (The "Evolution"):** The pattern reveals a calculated shift in tactics. After Phase 1 dismissals (2019–2021), Pedroza did not stop the misconduct; he refined it. He replaced "voluntary admissions" (which failed in court) with the "empty pockets" command scheme (which manufactured "hiding" claims). This evolution proves the violations were intentional and designed to evade judicial review, supporting the element of Malice.

- **Affirmative Participation (Moreno):** The data establishes that Defendant Moreno did not merely "supervise" but affirmatively participated in the violations as a "Gatekeeper." Moreno personally approved at least seven reports containing the verbatim identical "empty pockets for weapons" command scheme for unrelated suspects—a statistical and physical impossibility. This pattern of approving identical fabrications proves he acted with reckless disregard for the truth when he authorized the report in Plaintiff's case.

- **Municipal Custom (Deliberate Indifference):** The DA's office prosecuted these cases for eight years. The pattern evidence—specifically the prosecution of twenty-three Phase 1 and Phase 2 cases despite repeated dismissals and declinations—proves the "Blind Filing" custom alleged in Claim 7.

**2. Overview**

74. **The Scope of the Pattern.** Between May 2017 and August 2024, Trooper Pablo Pedroza employed substantially similar fabrication methodology across at least twenty-six unrelated traffic stops. His

Civil Action No. 7:25-cv-00393

investigative reports spanning eight years contain verbatim identical language, repeated "voluntary admissions" to crimes, and sequential patterns of behavior attributed to strangers that are statistically impossible.

75. **Judicial Validation of the Pattern.** The constitutional deficiency of Pedroza's stops was confirmed by a judicial finding in the case of *Lisa Southerland* (dismissed Feb. 2025). In that case, the court explicitly found "Lack of probable cause for the arrest" and "Lack of reasonable suspicion" regarding Pedroza's "odor of marihuana" script. This finding serves as a lens through which Pedroza's credibility must be viewed: a court has judicially determined that Pedroza manufactures probable cause to justify arrests, and that the District Attorney's Office prosecutes these baseless stops without verification.

76. **Tactical Evolution (Phase 1 to Phase 2).** The pattern evolved in response to judicial scrutiny.

   - **Phase 1 (2017–2020):** Characterized by (1) the verbatim "odor of marihuana emitting" script (appearing in at least twelve cases), (2) claims that suspects "voluntarily admitted" to crimes (appearing in at least ten cases), and (3) Pedroza's own written admissions of unconstitutional conduct (e.g., the "precautionary search" justification in *Jesus Eduardo Lopez* or detention for "becoming defensive" in *Ronaldo Gonzalez*). After these led to multiple dismissals and suppression hearings, Pedroza abandoned these specific tactics.

   - **Phase 2 (2022–2023):** Characterized by the "empty pockets for weapons" command scheme utilized against Plaintiff. Phase 2 cases eliminated the reliance on "voluntary admissions" from drivers. Instead of relying on suspects confessing to crimes (which failed in court), Pedroza refined his reporting to command suspects to reach into their own pockets, relying on claimed "hiding movements" to manufacture probable cause.

77. **Systematic Approval and Prosecution.** Despite this clear evolution, the conduct was systematically approved and prosecuted.

   - **Supervisory Approval:** Sgt. Longoria approved Phase 1 (including the "precautionary search" admission); Defendant Moreno approved Phase 2 (including at least seven "empty pockets" cases).

- **District Attorney:** Between 2017 and 2024, the Office prosecuted twenty-three Pedroza cases containing verbatim identical language. By the time charges were filed against Plaintiff, the Office possessed institutional knowledge of two suppression hearings arguing Fourth Amendment violations, two dismissals "in the interest of justice," and two declinations—yet continued to prosecute the pattern without verification.

## 3. Phase 1: The Foundational Pattern (2017-2020)

78. **Case: Erik Jamison Mora (May 30, 2017)**

> *Case No.: CR-17-10056-G*
>
> *Status: Dismissed after completing DWI court in another case*
>
> *DPS Case Report Supervisor: Sgt. Daniel Longoria*

Pedroza stopped Mora for speeding. Upon making contact with Mora, Pedroza's report states he "could smell a strong odor of marihuana coming from the vehicle." Pedroza asked Mora where the marihuana was and Mora "gave up two baggies of marihuana."

79. **Case: Jesus Eduardo Lopez (July 20, 2019)**

> *Case No.: CR-19-10223-F*
>
> *Status: Dismissed July 30, 2021 "In the Interest of Justice"*
>
> *DPS Case Report Supervisor: Sgt. Daniel Longoria*

Pedroza stopped Lopez for an "unsafe start." Lopez had no driver's license or insurance. Pedroza's report states: "Trooper Pedroza gave him the benefit of the doubt and allowed him to go, but only after conducting a pat-down to remove any possible contraband." The report further states: "As a precaution, Trooper Pedroza did not want the driver to carry contraband into the convenience store, so the pat-down was conducted before allowing him inside." The report also states: "asked him to empty his pockets in case of any contraband on his person." Pedroza reported that Lopez was "nervous." Lopez admitted to having marijuana in his left jean pocket. The case was dismissed in 2021 "in the interest of justice."

80. **Case: Ronaldo Gonzalez (August 10, 2019)**

> *Case No.:CR-19-10582-F*

Civil Action No. 7:25-cv-00393

*Status: Dismissed after pretrial diversion*

*DPS Case Report Supervisor: Sgt. Daniel Longoria*

Pedroza stopped Gonzalez for speeding. Upon making contact, Pedroza's report states he "could smell a strong odor of marihuana." Pedroza noticed the driver was "nervous, jittery and did not want to make eye contact." Pedroza asked Gonzalez if there was anything illegal in the vehicle because a search was going to be conducted. Gonzalez "got defensive and stated Trooper Pedroza needed a search warrant." Pedroza's report states: "Due to [driver] becoming defensive, Trooper Pedroza detained [driver] and placed him in handcuffs."

81. Lopez and Gonzalez reports were approved by Longoria within 21 days of each other.

82. **Case: Martin Olivar, Jr. (November 23, 2017)**

*Case No.: CR-17-01770-F*

*Status: Dismissed May 30, 2019 (same day as Motion to Suppress hearing)*

*DPS Case Report Supervisor: Sgt. Daniel Longoria*

Pedroza stopped a gray Ford Escape for speeding in a construction zone. The report contains: "strong odor of marihuana emitting from the vehicle" and driver "admitted to smoking marihuana 3 hours earlier and having a pipe." Defense counsel filed a Motion to Suppress Evidence on January 25, 2019, arguing that "tangible evidence seized in connection with this case was seized without lawful warrant, probable cause or other lawful authority" and that Olivar's detention violated his Fourth Amendment rights. A suppression hearing was scheduled for May 30, 2019, at 2:00 PM. Pedroza was subpoenaed to testify. On May 30, 2019—the same day as the scheduled suppression hearing—the court signed an Order of Dismissal.

83. **Case: Steven Rene Grimaldo (December 23, 2017)**

*Case No.: CR-18-04720-B*

*Status: Dismissed April 4, 2024 (due to conviction in another case)*

*DPS Case Report Supervisor: Sgt. Daniel Longoria*

Pedroza stopped Grimaldo for "Fail to Maintain a Single Lane." The report contains: "odor of marihuana emitting from the vehicle," driver was "nervous and sweating," and Grimaldo "admitted to having a smoking device (bong)." Pedroza claimed he "could see a glass container being covered

16

up by a backpack in the front seat." Defense counsel filed multiple suppression motions starting in April 2020: Motion to Suppress Statements and Motion to Suppress Evidence. The motions argued Grimaldo "was arrested without lawful warrant, probable cause or other lawful authority" and that "statements obtained from [Grimaldo] were obtained in violation" of constitutional rights. The case proceeded through dozens of pre-trial hearings from 2018 through 2024 before dismissal on April 4, 2024.

84. **Case: Roberto Arturo Osornio (September 29, 2018)**

  *Case No.: CR-19-04818-A*

  *Status: Dismissed with Plea*

  *DPS Case Report Supervisor: Sgt. Daniel Longoria*

Pedroza stopped Osornio for speeding. Upon making contact with Osornio, Pedroza's report states he "could smell an odor of marihuana emitting from the vehicle." Pedroza's report states he "told [Osornio] that he had probable cause to search the vehicle due to the strong smell of marihuana." Pedroza asked Osornio to step out of the vehicle, "patted him down," and had him walk to the front of the vehicle. Pedroza's report states he "found marihuana residue on the driver's side in between the seat and center console." In a hidden compartment in the center console, Pedroza found a small baggie of "a green leafy substance (possibly marihuana)." Upon further search, Pedroza found a green backpack in the trunk containing smaller baggies with "a green leafy substance (possibly marihuana)." Osornio was convicted for Delivery of Marihuana >1/4 oz ≤5 lbs.

85. **Case: Christian Rivera (April 29, 2020)**

  *Case No.: CR-1958-20-C*

  *Status: Plea*

  *DPS Case Report Supervisor: Sgt. Daniel Longoria*

Pedroza stopped Rivera. Pedroza's report states "strong odor of marihuana emitting from the vehicle" and that he observed a machete on the floorboard. Pedroza conducted an officer-controlled pat-down and found marijuana in Rivera's pocket. The report contains no photographs of the claimed machete despite other evidence being photographed.

86. **Case: Luis Francisco Guerrero (September 16, 2020)**

Civil Action No. 7:25-cv-00393

*Case No.: CR-21-00454-A*

*Status: Dismissed "In the Interest of Justice"*

*DPS Case Report Supervisor: Sgt. Daniel Longoria*

Pedroza stopped Guerrero. Pedroza's report describes Guerrero as "extremely nervous" and states Pedroza observed "green leafy substance on the center console" and a machete on the floorboard. Pedroza conducted an officer-controlled pat-down. The case was dismissed "in the interest of justice." The report contains no photographs of the claimed machete despite other evidence being photographed. Longoria approved this report.

87. When Pedroza articulated weapon concerns based on observing machetes (Rivera, Guerrero), he conducted officer-controlled pat-downs. Neither case contains photographs of the claimed machetes.

88. **Additional Phase 1 Cases:**

| Date | Name/Case No. | Verbatim Script Elements | Supervisor | Outcome |
|---|---|---|---|---|
| Oct 20, 2017 | Miguel Angel Chavez CR-18-01809-F | "strong odor of marihuana emitting from the vehicle"; driver "admitted to having marihuana and THC oil"; driver "handed Trooper Pedroza a small baggie" | Longoria | Dismissed (Pretrial Diversion) |
| Dec 28, 2017 | Ivan Laparra CR-1253-21-D | "odor of marihuana emitting from the vehicle"; driver "admitted he had a baggie of marihuana he found along the canal" | Longoria | Plea |
| Feb 12, 2018 | Adalberto Flores (No case no.) | "odor of marihuana emitting from the vehicle"; driver "nervous and made minimal eye contact"; driver "finally consented to a vehicle search" | Longoria | Plea |

18

Civil Action No. 7:25-cv-00393

| Date | Name/Case No. | Verbatim Script Elements | Supervisor | Outcome |
|------|---------------|--------------------------|------------|---------|
| Mar 26, 2018 | Saul De Leon CR-18-80401-B | "odor of marihuana emitting from the vehicle"; driver "nervous and made minimal eye contact"; driver admitted "yes" when asked if anything illegal | Longoria | Plea |
| Nov 19, 2018 | Rolando Rendon CR-18-15594-A | "strong odor of marihuana emitting from the vehicle"; driver "nervous and having a hard time speaking"; driver "admitted to having marihuana on their person" | Longoria | Plea |
| May 7, 2019 | Jeffrey Ortiz CR-19-09522-A | "strong odor of burnt marihuana emitting from the vehicle"; driver "nervous and jittery"; "due to [driver] not listening to commands" driver detained and searched | Longoria | Plea |
| Jul 24, 2017 | Adolfo Rivera CR-17-08583-F | Driver handed over drugs from backpack; report then claims: "Trooper Pedroza noticed the driver bent over and dropped an item onto the floor in an attempt to conceal it" | Sierra | Plea |

**Pattern Elements Across Phase 1 Cases**

89. **The "Odor of Marihuana Emitting" Script.** Twelve Phase 1 cases contain the verbatim "odor of marihuana emitting from the vehicle" or "strong odor of marihuana emitting from the vehicle" phrase:

- Mora: "strong odor of marihuana coming from the vehicle"

- Olivar: "strong odor of marihuana emitting from the vehicle"

19

Civil Action No. 7:25-cv-00393

- Chavez: "strong odor of marihuana emitting from the vehicle"

- Laparra: "odor of marihuana emitting from the vehicle"

- Grimaldo: "odor of marihuana emitting from the vehicle"

- Flores: "odor of marihuana emitting from the vehicle"

- De Leon: "odor of marihuana emitting from the vehicle"

- Osornio: "odor of marihuana emitting from the vehicle"

- Rendon: "strong odor of marihuana emitting from the vehicle"

- Gonzalez: "strong odor of marihuana"

- Ortiz: "strong odor of burnt marihuana emitting from the vehicle"

- Rivera: "strong odor of marihuana emitting from the vehicle"

90. **The "Nervousness" Script.** At least eight Phase 1 cases describe drivers as "nervous" using substantially similar language:

- Lopez: "nervous"

- Gonzalez: "nervous, jittery and did not want to make eye contact"

- Grimaldo: "nervous and sweating"

- Flores: "nervous and made minimal eye contact"

- De Leon: "nervous and made minimal eye contact"

- Rendon: "nervous and having a hard time speaking"

- Ortiz: "nervous and jittery"

- Guerrero: "extremely nervous"

91. **The "Voluntary Admission" Pattern.** At least ten Phase 1 cases contain driver admissions to possession or drug use:

- Mora: "gave up two baggies of marihuana"

- Lopez: admitted to having marijuana in his left jean pocket

20

Civil Action No. 7:25-cv-00393

- Olivar: "admitted to smoking marihuana 3 hours earlier and having a pipe"

- Chavez: "admitted to having marihuana and THC oil"; "handed Trooper Pedroza a small baggie"

- Laparra: "admitted he had a baggie of marihuana he found along the canal"

- Grimaldo: "admitted to having a smoking device (bong)"

- De Leon: admitted "yes" when asked if anything illegal

- Rendon: "admitted to having marihuana on their person"

- Flores: "finally consented to a vehicle search"

- Adolfo Rivera: handed over drugs from backpack

92. **The "Probable Cause to Search" Language.** At least two Phase 1 cases explicitly used the phrase "probable cause to search":

- Gonzalez: "due to the probable cause of a strong odor of marihuana"

- Osornio: "had probable cause to search the vehicle due to the strong smell of marihuana"

93. Supervisor Longoria approved virtually all Phase 1 reports, including: Lopez (admitting "precautionary" search and "in case of contraband"); Gonzalez (admitting detention for "becoming defensive"); and reports in cases later dismissed or suppressed (Olivar, Grimaldo, Chavez, Guerrero).

**4. Transition Period: Evolution of Tactics (May 2021 - December 2021)**

94. Between Phase 1 dismissals (2019-2021) and Phase 2 cases (2022-2023), three cases document the evolution of Pedroza's tactics while Phase 1 scripts continued.

95. **Case: Nicholas Joe Rodriguez (May 28, 2021)**

   *Status: Not prosecuted*

   *DPS Case Report Supervisor: Alberto Moreno*

   Pedroza stopped Rodriguez for speeding. Pedroza's report states he "smelled a strong odor of marihuana emitting from the vehicle." Pedroza's report states: "Trooper Pedroza had probable cause to search the vehicle due to the odor of marihuana emitting from the vehicle." Rodriguez stated a friend

21

of his left his marihuana inside his car and pulled out a coffee mug from under the passenger side chair seat cover containing a baggie of marihuana. Pedroza had Rodriguez step out of the vehicle and "gave him a quick pat down before he conducted a vehicle search of the vehicle." Rodriguez was arrested in Hidalgo County but was not prosecuted. Moreno approved this report.

96. **Case: Irvin Valerio Rojano Osorio (December 21, 2021)**

> *Case No.: CR-1633-22-I*
>
> *Status: Convicted*
>
> *DPS Case Report Supervisor: Alberto Moreno*

Pedroza stopped Rojano for running a red light and failing to stop at a yield sign during Operation Lone Star. Due to Rojano's story not adding up, Pedroza had Rojano step out of the vehicle to interview him further. Pedroza's report states: "For Trooper Pedroza's safety, he had Rojano pick up his shirt to his waistline to verify Rojano had no weapons when interviewing him. Trooper Pedroza observed a bulge in his right pocket and asked him to take out what he had to verify he had no weapons." As Rojano took out what he had in his pockets, Pedroza observed several small clear baggies of white rock like substance similar to Crack Cocaine. Rojano was convicted. Moreno approved this report.

97. **Case: Kevin Ray Vargas (December 24, 2021)**

> *Case No.: CR-22-07176-I*
>
> *Status: Dismissed after pretrial diversion*
>
> *DPS Case Report Supervisor: Alberto Moreno*

Pedroza stopped Vargas for driving without headlights. At that moment, Pedroza's report states he "could smell a strong odor of marihuana emitting from inside the cab of the pickup." Upon speaking with the driver, Pedroza's report states he "observed a dark green leafy substance on the driver's black shirt." Pedroza walked over to the driver's side and had Vargas step out of the vehicle for a vehicle search due to the strong odor of marihuana. Pedroza's report states: "Trooper Pedroza for his and Vargas's safety, had Vargas empty his pockets to verify he had no weapons and found a small blunt (small smoked marihuana cigarette)." Moreno approved this report.

98. Rojano and Vargas were arrested three days apart. Both reports contain the "empty pockets for

22

weapons" command language. Both were approved by Moreno. This language contrasts with Lopez's July 2019 report, which stated the command's purpose as "in case of any contraband on his person." After Lopez was dismissed "in the interest of justice" in July 2021, subsequent reports no longer stated "in case of contraband" but instead claimed "to verify he had no weapons."

**5. Phase 2: The Evolved Pattern (2022-2023)**

99. Between late 2021 and 2023, Pedroza's documented tactics shifted. Phase 2 cases no longer contained facially unconstitutional admissions like the "precautionary" search language or detention for "becoming defensive." Instead, these cases employed: the "empty pockets for weapons" command scheme; "hand hiding" claims; and continued use of the "odor of marihuana emitting" script in select cases. All Phase 2 cases were supervised by Alberto Moreno.

100. **Case: Roman Salinas (September 21, 2022)**

> *Case No.: CR-0812-24-D*
>
> *Status: Community Supervision*
>
> *DPS Case Report Supervisor: Alberto Moreno*

Pedroza's report states he asked Salinas to take out what he had in his pockets to make sure he did not have any weapons. As Pedroza had Salinas turn his body with his shirt up, Pedroza's report claims "Salinas kept hiding his left side and would turn it away from Trooper Pedroza." Pedroza detained and placed Salinas in handcuffs "due to not knowing Salinas could possibly have a weapon." After arresting Salinas, Pedroza told front passenger Rocio Denise Ramos about the charge. Pedroza's report states Ramos "was not phased and had no reaction" and claims "A normal person would have some reaction but Ramos did not." Pedroza's report articulates no other facts about Ramos. Pedroza conducted a full search of Ramos's person. Nothing was found. Moreno approved this report.

101. **Case: Plaintiff Angel Alanis (January 20, 2023)**

> *Case No.: CR-23-09932-A*
>
> *Status: Dismissed February 1, 2024*
>
> *DPS Case Report Supervisor: Alberto Moreno*

Plaintiff's arrest is alleged in paragraphs 11-63 above. Moreno approved Pedroza's report.

Civil Action No. 7:25-cv-00393

102. **Case: Lisa Southerland (November 3, 2023)**

> *Case No.: CR-6511-24-D*
>
> *Status: Dismissed February 2025*
>
> *DPS Case Supervisor: Lizandro Gonzalez*

Pedroza stopped Southerland for a welfare check. His report states "a strong odor of marihuana was emitting from inside the cab of the passenger car." Pedroza observed marijuana residue on Southerland's lap. Pedroza's report states: "Trooper Pedroza began a probable cause search of Southerland's vehicle" and "There was a lot of marijuana residue on the driver's side floorboard and a plastic bag that contained a strong odor of marihuana." In February 2025, the court dismissed Southerland's case with the finding: **"Lack of probable cause for the arrest. Lack of reasonable suspicion, insufficient evidence to proceed with the case."** Southerland's report contains three pattern elements also present in Osornio's September 2018 report: the "odor of marihuana emitting" language, "residue" observations, and "probable cause search" language. Osornio was convicted; Southerland was dismissed with judicial finding of lack of probable cause.

103. **Additional Phase 2 Cases:**

| Date | Name/Case No. | Pattern Elements Present | Supervisor | Outcome |
|------|---------------|--------------------------|------------|---------|
| Mar 14, 2022 | Herman Rivera Alarcon CR-5345-23-A | "Empty pockets" weapon command; legitimate Mexican ID characterized as "fictitious"; cocaine found in "several white baggies" | Moreno | Pending |
| May 16, 2022 | Hector Tadeo Ruiz CR-22-06639-F | "Nervous and fumbling"; "empty pockets" weapon command; "left hand was shuffling" language | Moreno | Convicted |
| Aug 13, 2022 | Dillon Jacob Diaz CR-0521-24-J | "Very anxious and nervous...swallowing a lot"; "empty pockets" weapon command; cocaine found "in his undergarments" | Moreno | Community Supervision |

Civil Action No. 7:25-cv-00393

| Date | Name/Case No. | Pattern Elements Present | Supervisor | Outcome |
|------|---------------|--------------------------|------------|---------|
| Sep 18, 2022 | Roel Medina (No case located) | "Odor of marihuana was emitting"; "acting nervous...hands were shaking"; "pushing something down with his right hand" | Moreno | Not prosecuted |
| Aug 3, 2024 | Andre David Alston CR-24-11101-E | "Strong odor of marijuana was emitting from the vehicle" | Gonzalez | Dismissed (ADR) |

**Pattern Elements Across Phase 2 Cases**

104. **The "Empty Pockets for Weapons" Command.** Seven Phase 2 cases contain the command requiring suspects to reach into their own pockets while claiming weapon concerns:

- Rojano: "asked him to take out what he had to verify he had no weapons"

- Vargas: "had Vargas empty his pockets to verify he had no weapons"

- Rivera Alarcon: "asked the driver to empty his pockets to make sure the driver had no weapons"

- Ruiz: "checked Ruiz for any weapons and asked Ruiz to empty his pockets"

- Diaz: "checked the driver for any weapons and asked him to empty his pockets"

- Salinas: "asked Salinas to take out what he had in his pockets to make sure he did not have any weapons"

- Plaintiff: "had [Plaintiff] exit his vehicle and empty his pockets to verify he had no weapons on his person"

105. This command is identical to the tactic in Lopez (July 2019), where Pedroza's report stated: "asked him to empty his pockets in case of any contraband on his person." After Lopez was dismissed "in the interest of justice" in July 2021, subsequent reports continued using the identical command but no longer stated "in case of contraband"—instead claiming "to verify he had no weapons."

106. In Rivera (April 2020) and Guerrero (September 2020), when Pedroza claimed to observe weapons, he conducted officer-controlled pat-downs. In the seven cases above where Pedroza articulated weapon concerns without claiming to observe weapons, he commanded suspects to empty their own pockets.

107. **The "Hand/Side Hiding" Language.** Four Phase 2 cases contain substantially similar language describing hand movements:

- Ruiz: "right hand inside his pocket and the left hand was shuffling for things"

- Medina: "observed Medina pushing something down with his right hand"

- Salinas: "Salinas kept hiding his left side and would turn it away from Trooper Pedroza"

- Plaintiff: "kept moving his left hand behind him" and "Alanis's left hand kept moving to his back left side"

108. **The Continued "Odor of Marihuana" Script.** The verbatim "odor of marihuana emitting" phrase that appeared in at least twelve Phase 1 cases continued in Phase 2:

- Vargas: "strong odor of marihuana emitting from inside the cab"

- Medina: "an odor of marihuana was emitting from inside the cab"

- Southerland: "a strong odor of marihuana was emitting from inside the cab of the passenger car"

- Alston: "a strong odor of marijuana was emitting from the vehicle"

109. This identical phrase appeared in at least seventeen cases spanning May 2017 through August 2024 involving different individuals stopped on different dates for different violations.

110. Phase 2 cases resulted primarily in convictions or community supervision: Rojano (convicted); Ruiz (convicted); Diaz (community supervision); Salinas (community supervision); Rivera Alarcon (pending); Vargas (dismissed after pretrial diversion); Medina (not prosecuted); Plaintiff (dismissed February 2024); Southerland (dismissed February 2025 with judicial finding of lack of probable cause); Alston (dismissed through Alternative Dispute Resolution).

Civil Action No. 7:25-cv-00393

**6. Supervisor-Specific Approval Patterns**

111. Across eight years and at least twenty-three cases, Pedroza's reports show distinct patterns based on which supervisor approved them.

112. **All "Empty Pockets for Weapons" Cases Approved by Moreno:**

| Date | Case | Supervisor |
|------|------|-----------|
| Dec 21, 2021 | Irvin Rojano Osorio | Moreno |
| Dec 24, 2021 | Kevin Ray Vargas | Moreno |
| Mar 14, 2022 | Herman Rivera Alarcon | Moreno |
| May 16, 2022 | Hector Tadeo Ruiz | Moreno |
| Aug 13, 2022 | Dillon Jacob Diaz | Moreno |
| Sep 21, 2022 | Roman Salinas | Moreno |
| Jan 20, 2023 | Plaintiff Angel Alanis | Moreno |

113. **All Officer-Controlled Pat Downs Approved by Longoria:**

| Date | Case | Weapon Articulated | Supervisor |
|------|------|-------------------|-----------|
| Sep 29, 2018 | Roberto Osornio | None (routine pat down) | Longoria |
| Aug 10, 2019 | Ronaldo Gonzalez | None (routine pat down) | Longoria |
| Apr 29, 2020 | Christian Rivera | Machete observed | Longoria |
| Sep 16, 2020 | Luis Guerrero | Machete claimed | Longoria |

114. Neither the Rivera nor Guerrero reports contain photographs of the claimed machetes despite other evidence being photographed in both cases.

115. At least eight cases contain the "empty pockets" command. Seven cases articulated weapon concerns and were approved by Moreno. One case admitted contraband purposes and was approved by Longoria.

27

116. When Pedroza articulated weapon concerns based on observing machetes (Rivera April 2020, Guerrero September 2020), he conducted officer-controlled pat-downs. In cases where Pedroza conducted probable cause vehicle searches (Osornio September 2018, Gonzalez August 2019), he also conducted officer-controlled pat-downs as part of the search process. All four were approved by Longoria.

**7. Judicial Findings Providing Notice (2017-2025)**

117. Between 2017 and 2025, at least eight of Trooper Pedroza's cases were dismissed or had evidence suppressed based on findings of constitutional violations, lack of probable cause, or insufficient evidence. These dismissals and suppression hearings provided notice to DPS supervisors and the DA's office that Pedroza's arrests contained constitutional deficiencies.

**8. Dismissals, Suppressions, and Non-Prosecutions Providing Notice (2017-2025)**

(a) Between 2017 and 2025, multiple Pedroza cases were dismissed, had evidence suppressed, or were not prosecuted. These outcomes provided notice to DPS supervisors and the DA's office that Pedroza's arrests contained constitutional deficiencies.

(b) **Cases with Suppression Activity:**

• **Martin Olivar, Jr. (November 23, 2017 arrest):** Defense filed Motion to Suppress Evidence arguing tangible evidence "was seized without warrant, probable cause or other lawful authority in violation" of Fourth Amendment rights. Suppression hearing scheduled for May 30, 2019. Pedroza subpoenaed to testify. Case dismissed May 30, 2019—same day as scheduled hearing. Olivar's report contained "strong odor of marihuana emitting from the vehicle" language.

• **Steven Rene Grimaldo (December 23, 2017 arrest):** Defense filed comprehensive suppression motions arguing Grimaldo "was arrested without lawful warrant, probable cause or other lawful authority" in violation of Fourth, Fifth, Sixth, and Fourteenth Amendment rights. Case proceeded through six years of suppression litigation with dozens of pre-trial hearings. Dismissed April 4, 2024 after conviction in another case. Grimaldo's report

contained "odor of marihuana emitting from the vehicle" language.

(c) **Cases Dismissed "In the Interest of Justice":**

- **Jesus Eduardo Lopez (July 20, 2019 arrest):** Dismissed July 30, 2021. Lopez's report contained facially unconstitutional admission of "precautionary" search.

- **Luis Francisco Guerrero (September 16, 2020 arrest):** Dismissed "In the Interest of Justice." Guerrero's report contained "green leafy substance" and machete claim with officer-controlled pat down.

(d) **Cases Dismissed Through Pretrial Diversion:**

- **Miguel Angel Chavez (October 20, 2017 arrest):** Dismissed through pretrial diversion. Chavez's report contained "strong odor of marihuana emitting from the vehicle" language.

- **Kevin Ray Vargas (December 24, 2021 arrest):** Dismissed after pretrial diversion. Vargas's report contained "strong odor of marihuana emitting from inside the cab" and "empty pockets for weapons" command.

(e) **Cases Not Prosecuted:**

- **Nicholas Joe Rodriguez (May 28, 2021 arrest):** Arrested in Hidalgo County, not prosecuted. Report contained "strong odor of marihuana emitting from the vehicle" and "probable cause to search" language.

- **Roel Medina (September 18, 2022 arrest):** Not prosecuted. Report contained "odor of marihuana was emitting" language.

(f) **Case with Explicit Judicial Finding:**

- **Lisa Southerland (November 3, 2023 arrest):** Dismissed February 2025 with explicit judicial finding: "Lack of probable cause for the arrest. Lack of reasonable suspicion, insufficient evidence to proceed with the case." Southerland's report contained "a strong odor of marihuana was emitting from inside the cab" language, "residue" observations, and "probable cause search" language.

118. Between Phase 1 dismissals (2019-2021) and Plaintiff's arrest (January 2023), DPS supervisors and the DA's office had notice through: courts finding Pedroza's arrests constitutionally deficient

via dismissals and suppressions; Pedroza's reports containing facially unconstitutional admissions (Lopez "precautionary" search, Gonzalez detention for "becoming defensive"); and identical "odor of marihuana emitting" scripts resulting in dismissals and suppression litigation (Olivar, Grimaldo, Chavez). Despite this notice, Phase 2 cases continued to be approved and prosecuted.

**9. Supervisory Liability: Moreno**

119. Defendant Pedroza's systematic fabrications were not isolated acts but were approved and directly enabled by DPS Supervisor Alberto Moreno across the transition and Phase 2 periods. Moreno approved numerous reports containing verbatim identical scripts and pattern elements that made the violations evident, demonstrating deliberate indifference to clearly established rights.

120. Moreno approved at least nine cases between May 2021 and January 2023 containing substantially similar pattern elements, including Plaintiff's arrest report. These approvals occurred after DPS had institutional notice from Phase 1 dismissals and suppressions (2019-2021), yet Moreno continued approving and thereby facilitating Pedroza's refined tactics without correction.

121. Moreno approved Rodriguez (May 2021) containing Phase 1 "odor emitting" script and "probable cause to search" language. Rodriguez was arrested in Hidalgo County but not prosecuted.

122. In December 2021, Moreno approved Rojano (December 21) and Vargas (December 24) within three days of each other. Both reports contain the "empty pockets for weapons" command language.

123. Moreno approved at least seven cases containing the "empty pockets for weapons" command between December 2021 and January 2023. All cases involving unrelated individuals stopped on different dates for different violations, yet contained verbatim identical command language and substantially similar justifications.

124. Moreno approved Salinas's September 2022 report stating he searched passenger Rocio Ramos because she "was not phased [sic] and had no reaction" to Salinas's arrest. The report articulates no other facts about Ramos.

125. Moreno's repeated approvals of these reports—containing contradictions between articulated weapon fears and actions requiring suspects to reach into their own pockets, verbatim identical language

Civil Action No. 7:25-cv-00393

across unrelated cases, and facially insufficient justifications like Ramos's "no reaction" search—directly caused Plaintiff's constitutional violations. By personally approving Pedroza's fabricated report in Plaintiff's case and eight substantially similar reports in the thirteen months prior, Moreno affirmatively participated in the exact tactics used against Plaintiff, allowing false probable cause to proceed unchallenged to arrest, detention, and prosecution.

## E.  The District Attorney's Investigatory Function and Institutional Knowledge

126. After Plaintiff's arrest on January 20, 2023, and detention from January 20-30, 2023, Defendant Pedroza's police reports and probable cause affidavit were submitted to the Hidalgo County District Attorney's Office for review and charging decisions.

127. Defendant John Doe, Assistant District Attorney, performed investigatory functions by reviewing Pedroza's reports before filing a criminal complaint on August 31, 2023—more than seven months after Plaintiff's arrest.

128. This seven-month period provided time to: request and review video evidence, verify the legal status of seized substances, consult prior cases involving Pedroza, cross-reference report language against other prosecutions, and investigate the factual basis for charges.

129. By August 2023—when Defendant John Doe filed charges against Plaintiff—the Hidalgo County District Attorney's Office had prosecuted twenty Pedroza cases over the preceding six years containing the verbatim boilerplate scripts and tactics detailed in paragraphs 68–113 and, crucially, had **declined to prosecute two additional Pedroza arrests** (Nicholas Joe Rodriguez, May 2021; Roel Medina, September 2022) after evidently concluding they lacked sufficient evidentiary or constitutional basis. The office was also on notice of multiple adverse outcomes in prosecuted Pedroza cases, including two cases with active suppression litigation explicitly challenging Fourth Amendment violations (Grimaldo, Olivar), multiple dismissals "in the interest of justice" and on the day of scheduled suppression hearings, and pretrial-diversion dismissals.

130. Despite this repeated, direct notice—including the office's own decisions not to prosecute certain Pedroza arrests and numerous courtroom losses signaling systemic problems with his probable-

cause assertions—the office maintained its customs of filing charges without video review, without officer-credibility tracking, without cross-case pattern analysis, and without verifying that charged substances are actually controlled under law, and had implemented no verification systems or enhanced review procedures when Defendant John Doe reviewed Plaintiff's case in August 2023.

## F. Defendant John Doe's Mechanical Incorporation Without Verification

131. Defendant John Doe filed the criminal complaint on August 31, 2023—more than seven months after Plaintiff's January 20, 2023 arrest—by incorporating Pedroza's reports and probable cause affidavit into the charging instrument without independent verification, despite laboratory results identifying one seized substance as loperamide and despite the office's institutional knowledge of Pedroza's reporting patterns detailed in paragraphs 68–113.

132. Loperamide is the active ingredient in over-the-counter Imodium and does not appear in Texas Health & Safety Code §§ 481.102–481.105 (Penalty Groups 1–4) or in any schedule of the federal Controlled Substances Act. Possession of loperamide is not a criminal offense under Texas or federal law.

133. In the seven months available before filing, Defendant John Doe took none of the following readily available steps: (a) checking the Texas Penalty Group statutes to confirm whether loperamide is a controlled substance; (b) requesting or reviewing the dashcam and bodycam footage; (c) cross-referencing Pedroza's report language against the office's prior Pedroza prosecutions; or (d) verifying the prescription status of the remaining seized medications.

134. Had Defendant John Doe requested the video evidence, it would have shown: Pedroza's bodycam was pre-angled downward before contact, preventing any recording of Plaintiff's upper-body movements during the period Pedroza later claimed to observe "hiding"; dashcam footage captured Plaintiff's hands remaining visible and compliant throughout the out-of-vehicle phase; Pedroza physically palpated a soft baggie at 5:20 and confirmed through touch that it contained no weapon; at timestamp 36:22 Pedroza stated his "hiding" claims referred to the out-of-vehicle phase; and the movements Pedroza described as suspicious occurred only while Plaintiff complied with Pedroza's direct commands.

Civil Action No. 7:25-cv-00393

135. Had Defendant John Doe consulted the Texas Health & Safety Code §§ 481.102–481.105, the statutes would have confirmed that loperamide is not listed in any penalty group.

136. Had Defendant John Doe cross-referenced Pedroza's report against prior Pedroza cases on file with the office, he would have identified the verbatim identical language and patterns detailed in paragraphs 68–113.

137. Under *Chiaverini v. City of Napoleon*, 602 U.S. ___ (2024), a Fourth Amendment malicious prosecution claim may proceed as to any charge that lacks probable cause, even if other charges in the same proceeding are supported. The loperamide possession charge lacked probable cause because loperamide is not a controlled substance. Both charges rested on evidence obtained from the searches and seizure described above; video evidence contradicts Pedroza's claims of pre-search "hiding movements," shows Plaintiff's hands remained visible and compliant on dashcam, and shows the described movements occurred only in response to Pedroza's commands.

### G. Hidalgo County's Customs Enabling Constitutional Violations

138. The Hidalgo County District Attorney's Office maintained customs and practices that operated over eight years (2017-2025) through which it: (1) filed charges without reviewing available video evidence; (2) maintained no officer credibility tracking system; (3) conducted no cross-case pattern analysis; (4) implemented no substance verification protocol; and (5) mechanically incorporated police reports without independent verification.

139. The office's handling of the Pedroza cases alleged in paragraphs 68–113 above demonstrates these customs operated systematically: the office prosecuted at least twenty-three cases spanning eight years, including Phase 1 cases with identical scripts and Phase 2 cases with identical commands, without implementing any of the above verification procedures.

### 1. Custom of Filing Charges Without Video Review

140. The office filed criminal charges without requiring prosecutors to request, review, or meaningfully act upon available dashcam or bodycam footage, even when probable cause rested solely on an officer's claimed visual observations of suspect movements.

Civil Action No. 7:25-cv-00393

141. Across the Phase 1 and Phase 2 Pedroza cases alleged in paragraphs 68–113 (including Plaintiff's), the office followed this custom and filed charges without regard to video evidence that, in Plaintiff's case, would have revealed the bodycam was pre-angled downward before contact began (making pre-search "hiding" claims unverifiable) and the dashcam showed Plaintiff's hands visible, compliant, and responding only to Pedroza's commands.

**2. Custom of No Officer Credibility Tracking**

142. The office maintained no system to track or flag officers with patterns of dismissed cases, declined prosecutions, or identical report language.

143. By August 2023, the office had prosecuted at least twenty Pedroza cases and declined to prosecute two additional Pedroza arrests. Multiple cases resulted in dismissals "in the interest of justice" or on the day of scheduled suppression hearings. The office maintained no system to flag Pedroza for enhanced scrutiny, no tracking of his case outcomes, and no heightened review protocols.

**3. Custom of No Cross-Case Pattern Analysis**

144. The office conducted no comparative review of multiple cases from the same officer to identify identical language or systematic patterns.

145. The office prosecuted the cases alleged in paragraphs 68–113 containing: "odor of marihuana emitting from the vehicle" in at least fifteen cases; "asked [driver] to empty his pockets to make sure [driver] had no weapons" verbatim in eight cases; and "left/right hand was shuffling/hiding/kept moving" in at least four cases. The office implemented no cross-case analysis procedures.

**4. Custom of No Substance Verification**

146. The office filed possession of controlled substance charges without verifying that the charged substance is controlled under state or federal law.

147. In Plaintiff's case, the office had: laboratory confirmation identifying loperamide; seven months between arrest and filing; Texas Health & Safety Code §§ 481.102-105 readily available; and verifi-

cation requiring minutes. The office filed possession charges for loperamide, which does not appear in any Texas Penalty Group or federal schedule and is available over-the-counter.

### 5. Custom of Accepting Police Reports Without Verification

148. The office mechanically incorporated police reports into charging documents without independent verification of factual claims or internal consistency.

149. The office prosecuted cases alleged in paragraphs 68–113 where reports contained: Lopez's admission of "precautionary" search; Gonzalez's admission of detention for "becoming defensive"; claimed observation of bulge from opposite side of vehicle; claimed "prescription medication without a prescription" despite preventing Plaintiff from retrieving prescription documentation at 4:46 and finding prescribed Nardil in a labeled CVS bag during vehicle search; and identical "empty your pockets to make sure you have no weapons" language across nine cases paired with claimed weapon fears.

### 6. Corroboration of Customs via Concurrent McAllen PD Incident

150. The systematic nature of the District Attorney's "Blind Filing" custom is definitively corroborated by the Office's conduct toward Plaintiff in a separate, concurrent matter (see *Alanis v. Lozano, et al.*, Civil Action No. 7:25-cv-00443, S.D. Tex.).

151. On or about September 18, 2023—less than three weeks after filing the baseless Loperamide charges in this case—the same District Attorney's Office accepted and filed charges against Plaintiff in that concurrent matter.

152. The "Blind Filing" custom is evidenced by the fact that the Office rubber-stamped the McAllen PD file despite facial invalidities and evidence of suppression:

- **Facial Admission of Unconstitutional Arrest:** The police reports explicitly documented a chronology where Officer Lozano arrested Plaintiff immediately upon arrival, and Officer Rodriguez arrived to find Plaintiff *already* handcuffed before any officer had spoken to the alleged

victim or conducted an investigation. The DA's Office indicted despite the report admitting the seizure preceded the probable cause.

- **Forensic Impossibility:** The Office filed Aggravated Assault charges alleging a "prolonged violent assault" despite the crime scene report documenting "minimal blood" and "no apparent signs of a struggle"—a physical contradiction visible without needing external evidence.

- **Video Review Failure (Garza Fabrication):** The Office incorporated an interrogation report that invented a "fighting" scenario regarding Plaintiff's injuries that neither party described and fabricated consciousness of guilt by claiming Plaintiff was "calm" when accused of self-harm, when video proves he was in visible distress and wanting to terminate the interview. The Office's failure to review the video allowed these systematic inversions of reality to pass into the indictment.

- **Active Suppression of Evidence:** McAllen PD transferred both the interrogation video and the complainant's recorded statement to the DA's Office. Despite actual possession of this exculpatory evidence, the DA's Office withheld these recordings from defense counsel, demonstrating that the "Blind Filing" custom is accompanied by a deliberate practice of suppressing objective evidence that contradicts police narratives.

153. The statistical improbability of the District Attorney's Office inadvertently rubber-stamping two facially deficient cases against the same Plaintiff, originating from two different agencies (DPS and McAllen PD), within a single 19-day window (August 31 to September 18, 2023) establishes that the "Blind Filing" custom is not limited to Trooper Pedroza but is the standard operating procedure for the entire Office.

154. *Note on Scope:* Plaintiff pleads these facts solely as evidentiary proof of the Defendant District Attorney's administrative customs and deliberate indifference in the instant action. Plaintiff seeks no damages for the McAllen PD arrest in this specific lawsuit, as those claims are the subject of the separate litigation referenced above.

### 7. Notice and Failure to Implement Safeguards

155. The safeguards the office failed to implement were readily available and required minimal resources: video review equipment already existed in the office; credibility tracking required only a basic spreadsheet or database entry; pattern analysis required only word-search functions across digital files; substance verification required consulting statutes available online; enhanced review procedures required only internal policy memoranda.

156. Between 2017 and August 2023, the office received escalating notice through suppression hearings explicitly challenging Fourth Amendment violations, dismissals occurring on the day officers were scheduled to testify, dismissals "in the interest of justice," and prosecutorial decisions declining to file charges. By February 2025, a court explicitly found "lack of probable cause for the arrest" and "lack of reasonable suspicion" in a Pedroza case prosecuted after Plaintiff's.

157. Despite this escalating notice spanning eight years, the office implemented none of these safeguards. The continued adherence to practices the office knew enabled constitutional violations—demonstrated through its own declinations to prosecute certain Pedroza arrests and repeated courtroom losses—reflects deliberate indifference rather than mere negligence.

### 8. Causation

158. Had the office required video review, Defendant John Doe would have identified the contradictions in Pedroza's reports before filing charges. Had the office tracked officer credibility, Defendant John Doe would have been alerted to Pedroza's pattern. Had the office verified substances, Defendant John Doe would have confirmed loperamide is not controlled. Had the office conducted cross-case analysis, Defendant John Doe would have identified verbatim identical language. Had the office required independent verification, Defendant John Doe would have questioned internal contradictions.

159. As a direct and proximate result of these customs, Plaintiff suffered deprivation of his Fourth Amendment right to be free from malicious prosecution and his Fourteenth Amendment right to due process. The customs caused Plaintiff to endure detention from January 20-30, 2023, and malicious prosecution from August 31, 2023, through February 1, 2024.

160. Under *Chiaverini v. City of Napoleon*, if any charge lacks probable cause, a malicious prosecution claim may proceed. Both charges lacked probable cause: the loperamide charge because loperamide is not controlled, and the fabricated-evidence charge because video contradicts Pedroza's claimed "hiding" movements.

## V. TOLLING OF LIMITATIONS

### A. Fraudulent Concealment

161. Beyond the fabrication itself, Defendant Pedroza undertook specific affirmative acts designed to prevent Plaintiff from discovering the constitutional violations. These acts operated to manipulate Plaintiff's perception of reality, inducing self-blame and confusion rather than suspicion of misconduct.

162. **Pre-Angled Bodycam Concealment.** Before initiating contact, Defendant Pedroza angled his bodycam downward at his khakis, creating an intentionally incomplete record. This affirmative act ensured that the period where he later claimed to observe "hiding" movements (the wallet search) was not visually recorded. This prevented Plaintiff—and any subsequent reviewer—from verifying whether the alleged movements actually occurred.

163. **Gaslighting via Contradictory Commands.** During the stop, Defendant Pedroza utilized a technique of contradictory commands to induce confusion and conceal his fabrication. By issuing vague or conflicting orders—specifically regarding the sequence of pocket emptying and shouting "get your hand out" immediately after ordering Plaintiff to empty his pockets—Pedroza created a chaotic environment where Plaintiff felt confused about how to lawfully obey. When Plaintiff hesitated or adjusted his movements in response to this induced confusion (e.g., moving to the left pocket after emptying the right, or hesitating when told to "take that out"), Pedroza treated this confusion as suspicious.

164. **The Induced Apology (Proof of Concealment).** The effectiveness of this gaslighting was immediate. Overwhelmed by the contradictory commands and believing he had clumsily failed to follow instructions, Plaintiff apologized to Defendant Pedroza while being frisked in front of the patrol car,

immediately following the arrest. This apology demonstrates that Plaintiff did not know a constitutional violation was occurring at the time of arrest; rather, Pedroza's manipulation had successfully convinced Plaintiff that his own confused compliance was the cause of the escalation. This state of mind—induced by Pedroza's affirmative acts—prevented Plaintiff from suspecting that the probable cause was being fabricated.

165. **Reinforcement and Neutralization in the Patrol Car.** After inducing the apology, Defendant Pedroza reinforced the false narrative inside the patrol car to cement Plaintiff's belief that he was at fault. Pedroza repeatedly insisted—at least eleven times—that Plaintiff had actively "hidden" contraband "from me" during the search. When Plaintiff attempted to assert that the contraband "was always there before the lights turned on" (implying no active hiding occurred), Defendant Pedroza immediately neutralized this defense by falsely asserting: "You were hiding it from me... while you were looking for your wallet." This specific gaslighting technique directly exploited Plaintiff's insecurity about his clumsy fumbling to find his wallet earlier in the stop. By reframing Plaintiff's lawful, clumsy search as "hiding," Pedroza manipulated Plaintiff's interpretation of his own conduct. Plaintiff was led to believe that his specific actions—hesitating, taking too long, or fumbling—had objectively constituted "hiding" or "suspicious concealment" to a trained officer. Plaintiff accepted that his own behavior had created the legal justification for the arrest, obscuring the fact that the "hiding" narrative was a premeditated fabrication.

166. **Affirmative Concealment via "Temporal Transposition."** Defendant Pedroza affirmatively concealed the fabrication by transposing his alleged observations in the written record. In his investigative report and affidavit, Pedroza claimed to observe "hiding movements" while Plaintiff was seated and searching for his wallet. However, Pedroza's own admission at timestamp 36:22 reveals that his "hiding" claims actually referred to the later out-of-vehicle search phase (specifically, when Plaintiff hesitated while reaching into his waistband as commanded to "take that out"). By taking the allegation of hiding—which relied on the later out-of-vehicle movements—and falsely recording it as an observation occurring during the earlier unrecorded wallet-search phase, Pedroza created a falsified record that could not be visually disproven by the bodycam (angled down) or dashcam (blocked view). This transposition concealed the lie within the timeline itself.

167. **Sworn Affidavit Manipulation.** Defendant Pedroza specifically invoked "weapon fear" as legal justification in his reports and affidavit despite having ordered Plaintiff to empty his own pockets and despite physically palpating a soft baggie confirming it contained no weapon. By exploiting specific legal standards under *Terry v. Ohio*, Pedroza concealed the objective unreasonableness of his actions from a layperson. Plaintiff, lacking legal training, could not know that commanding a suspect to empty their own pockets is physically inconsistent with genuine *Terry* weapon fears.

168. **Suppression of Exculpatory Record.** Defendant Pedroza fabricated the blanket claim that Plaintiff possessed "prescription medication without a prescription." This fabrication conflated two distinct sets of medication to create a false narrative. First, regarding the loose blister packs found on Plaintiff's person, Pedroza affirmatively suppressed Plaintiff's attempt to retrieve verifying documentation from the glove compartment ("no no no, stay over here"). Although Plaintiff was aware of this command, he attributed it to the fact that these specific blister packs were not in original packaging and appeared irregular, leading him to believe the restriction was a valid response to the packaging rather than an act to conceal evidence. Second, regarding the separate Nardil found in the vehicle, Pedroza deliberately ignored the labeled CVS bag. By suppressing the video record of documentation for the on-person items and ignoring the labels for the in-vehicle items, Pedroza maintained the absolute falsehood of "no prescription" across the entire encounter.

169. **Evolution of Concealment Tactics.** These concealment techniques were not accidental but deliberately refined. Between 2017 and 2020, Pedroza's reports contained crude fabrications that led to dismissals, such as admitting to "precautionary" searches. In response to these judicial findings, Pedroza evolved to the sophisticated techniques employed against Plaintiff: pre-positioning cameras to prevent verification, utilizing contradictory commands to induce suspect confusion, and utilizing temporal transposition in reports. This pattern of evolution demonstrates that the concealment in Plaintiff's case was an affirmative, calculated effort to prevent the detection that had occurred in his prior cases.

170. **Enumeration of Unknowns.** As a direct result of these concealment acts, Plaintiff was unaware of the critical facts constituting the cause of action. Specifically, Plaintiff was unaware that Defendant Pedroza's bodycam was positioned downward to intentionally prevent verification; was unaware that

"weapon fear" invoked specific legal requirements contradicted by the officer's own commands; was unaware that the temporal placement of observations in the affidavit had been manipulated to create probable cause where none existed; and was unaware that his commanded compliance was being characterized as voluntary "hiding" movements in the official record.

## B. Inability to Discover Despite Diligence

171. Plaintiff remained unaware of the concealed evidence due to specific physical and technical barriers to discovery.

172. **Incarceration and Physical Barriers.** Although defense counsel filed a discovery motion in September 2023 and likely received materials shortly thereafter, Plaintiff was incarcerated from August 2023 through January 2024. During this entire window, Plaintiff possessed no physical means to view digital video files, listen to audio, or review the synchronized footage necessary to detect the fabrication.

173. **Latent Nature of the Fabrication.** The constitutional violations were not apparent on the face of the records available to counsel. Because Pedroza employed "Temporal Transposition"—writing a narrative that matched the unrecorded wallet-search phase—a standard legal review by counsel (relying on the presumption of regularity) would not reveal the lie. Detecting the fabrication required forensic synchronization to reveal that the reported "hiding" movements were actually transposed from a later time. This fact was not discoverable by counsel (who relied on the presumption of regularity and the incomplete video record) nor by Plaintiff (whose ability to identify the discrepancy was neutralized by the Defendant's gaslighting, which led him to believe his own conduct was the source of the suspicion). Because Plaintiff was incarcerated and unable to communicate minute-by-minute video discrepancies to counsel, the fabrication remained a latent defect hidden within the technical data.

174. **Combination of Factors Required for Discovery.** Discovery of the violation was impossible without overcoming a formidable combination of barriers. It required: (1) synchronized video analysis to align the dashcam and bodycam; (2) frame-by-frame comparison of the bodycam field-of-view

against Pedroza's claimed observations to prove the angle obscured the critical moments; (3) audio-timestamp alignment connecting Pedroza's patrol car admissions to specific video segments of the search; (4) knowledge of standard officer safety protocols (derived from *Terry v. Ohio*) to recognize that commanding a suspect to reach into their own pockets is physically inconsistent with a genuine fear of weapons; (5) legal knowledge of *Rodriguez v. United States* regarding mission creep; (6) recognition of the specific temporal manipulation techniques used in the affidavit; (7) understanding of how real-time verbal mischaracterization creates falawfulness; and (8) recognition that commanding compliance creates false narratives of voluntary suspicious behavior. This sophisticated forensic and legal analysis was beyond the capability of a layperson, particularly one subject to the gaslighting described above and who was incarcerated during the critical period when discovery materials were first produced to counsel.

175. **Reliance on Presumption of Regularity.** Plaintiff and his counsel reasonably relied on the "Official Record"—specifically the sworn Probable Cause Affidavit and Investigative Reports—as being truthful accounts of the officer's observations. The legal system and the attorney-client relationship are built on the presumption of regularity; without specific evidence to the contrary, counsel must assume an officer's sworn statement is not a wholesale fabrication. Because the video was pre-angled downward, it did not facially contradict the report; rather, the lack of visual evidence was interpreted by counsel through the lens of the sworn report, leading to the conclusion that the "hiding" occurred in the blind spot, rather than not occurring at all.

176. **Discovery Date and Immediate Action.** Plaintiff did not and could not discover the fabrication until June 20, 2025, when he acquired the necessary legal knowledge regarding *Terry* weapon-fear requirements through an educational video explaining the doctrine. Upon this realization, Plaintiff acted with immediate and maximum diligence: he contacted former counsel and obtained his case materials on June 20, 2025. Over the next ten days, Plaintiff conducted a forensic review, performing frame-by-frame analysis of synchronized video and aligning Pedroza's reports with exculpatory dashcam footage and patrol car admissions. Plaintiff mailed the suit just 11 days later on July 1, 2025; the complaint was received by the Court on July 2, 2025; and it was formally filed on August 8, 2025.

Civil Action No. 7:25-cv-00393

177. **Overcoming the Concealment During Forensic Review.** The specific forensic analysis described above was necessary because the concealment was designed to survive standard scrutiny. When Plaintiff initially viewed the bodycam footage on June 20, the officer's tactics initially succeeded in creating doubt. Because the camera was angled downward and missed the critical interactions, and because Plaintiff had been psychologically conditioned by the officer's gaslighting to blame himself, his initial reaction to the footage was uncertainty rather than vindication. It was only through the subsequent ten days of intense synthesis of the physical contradictions—specifically the "empty pockets" command, the unannounced door breach, and the dashcam footage—that Plaintiff pierced this confusion, overcame the concealment, and exposed the fabrication.

178. **Conclusion on Tolling.** Fraudulent concealment tolled limitations on the January 20, 2023 claims until June 20, 2025, when Plaintiff, despite reasonable diligence, first could and did discover the concealed fabrication through synchronized video analysis combined with the legal knowledge necessary to recognize the constitutional violations concealed by Defendant Pedroza's deliberate techniques.

## C. Tolling for Malicious Prosecution (Loperamide Charge)

179. Regarding the Malicious Prosecution claim (Claim 8), limitations were further tolled by Plaintiff's reasonable reliance on the District Attorney's implied representation of law. A citizen is entitled to presume that a District Attorney has verified that a chemical substance is actually illegal before filing a criminal charge. Plaintiff reasonably relied on the District Attorney's false assertion in the charging instrument that Loperamide was a controlled substance. The falsity of this assertion was concealed by the presumption of regularity afforded to prosecutorial filings, and was not discovered until Plaintiff personally researched the Texas Penalty Groups in 2025.

## D. Discovery Rule

180. In the alternative, the discovery rule defers accrual of Plaintiff's claims because the injury—specifically, the deprivation of liberty through fabrication of evidence—was both inherently undiscoverable and objectively verifiable.

181. **Inherently Undiscoverable Nature of the Injury.** Unlike a typical false arrest where a plaintiff immediately knows the officer's stated reason is false (e.g., claiming a red light was run when it was green), the injury here was latent. The "hiding" allegations were not based on total fiction, but on a "Temporal Transposition" of Plaintiff's actual, compliant movements from a later time to an earlier, unrecorded time. Because the lie was built upon Plaintiff's *actual movements* (simply shifted in time), the falsity was not apparent to Plaintiff, who knew he had moved his hands but lacked the ability to distinguish between the officer's characterization of those movements and reality without synchronized video analysis.

182. **Effect of Gaslighting on Discoverability.** The injury was further rendered undiscoverable by the psychological manipulation employed at the scene. Defendant Pedroza's use of rapid-fire contradictory commands induced a state of confusion and self-blame in Plaintiff. As evidenced by Plaintiff's statement "I'm sorry" at timestamp 8:55, Plaintiff subjectively believed that his own clumsy compliance had caused the escalation. Because Plaintiff believed he was at fault, the constitutional violation (fabrication) was effectively invisible to him. A layperson who believes their own error caused their arrest cannot reasonably be expected to discover that the officer actually fabricated the probable cause.

183. **Objectively Verifiable Evidence.** The existence of the injury is objectively verifiable by direct physical evidence. It does not rely on "he said/she said" testimony. The "Temporal Transposition" is proven by the immutable data of the synchronized audio-video timestamps (aligning the patrol car admission at 36:22 with the dashcam footage at 3:46). The "Pre-Angled Bodycam" is proven by the frame-by-frame field of view analysis. The fabrication is thus documented by objective digital records that exist independently of witness memory.

184. **Conclusion on Accrual.** Because the injury was of a type that is inherently undiscoverable by a layperson subject to gaslighting and temporal manipulation, and because the injury is objectively verifiable through digital forensics, the cause of action did not accrue until June 20, 2025, when Plaintiff, through acquisition of legal knowledge via educational video and forensic video analysis, discovered the nature of the injury—specifically, that his deprivation resulted from temporal manipulation and fabrication rather than from his own conduct as he had been led to believe through

gaslighting.

# VI. FIRST CLAIM FOR RELIEF

**Fourth Amendment Violations—Unlawful Stop, Search, and Arrest**

**(Against Individual Defendant Pedroza)**

## A. Unlawful Stop Extension (Rodriguez Violation)

185. Plaintiff incorporates all preceding paragraphs.

186. **Legal Standard.** A traffic stop cannot extend beyond the time reasonably required to complete the mission of issuing a ticket. Authority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed. *Rodriguez v. United States*, 575 U.S. 348 (2015).

187. **The "Rodriguez Moment".** The stop's mission was effectively completed at 2:48 when Plaintiff produced his driver's license. At that moment, Defendant Pedroza had all information necessary to issue the citation.

188. **Unlawful Extension.** Instead of concluding the stop, at *:02, Defendant Pedroza unlawfully extended the seizure by opening Plaintiff's vehicle door unannounced.

   - **No Reasonable Suspicion:** At 3:02, immediately prior to the breach, Defendant Pedroza had observed no contraband, detected no odor, and witnessed no weapon. No items—including the Delta-8 product—were visible to him until *after* he unlawfully opened the door.

   - **Fabricated Justification:** Pedroza's claims of "hiding movements" are affirmatively disproven by the forensic timeline. The specific physical actions Pedroza cited as suspicion—"turning" and "moving hands"—are captured on dashcam occurring only *after* the breach, during the out-of-vehicle search. By transposing these later compliant actions into the pre-breach timeline, Pedroza manufactured a justification that is objectively contradicted by the synchronized video record.

Because the extension was not supported by reasonable suspicion, every subsequent minute of detention violated the Fourth Amendment.

Civil Action No. 7:25-cv-00393

## B. Unlawful Searches (Terry Violation)

189. **Legal Standard.** Warrantless searches are per se unreasonable. To conduct a protective frisk (*Terry* stop), an officer must have reasonable suspicion that the person is "armed and dangerous."

190. **The Unlawful Door Opening.** Opening the vehicle door constitutes a search. Pedroza lacked probable cause or reasonable suspicion to breach the vehicle's interior at 3:02.

191. **The "Terry Paradox".** Pedroza searched Plaintiff's pockets without a valid *Terry* justification. His conduct objectively disproved his own claimed "weapon fear":

- **The "Empty Pockets" Contradiction:** An officer who genuinely fears a suspect has a gun does not order the suspect to reach into their own pockets. Pedroza's command to "empty your pockets" (used in eight prior cases) proves he did not subjectively fear a weapon but was using "safety" as a pretext for an unlawful search.

- **The "Soft Bag" Palpation:** At 5:30, Pedroza physically palpated the back pocket and felt a soft baggie. He confirmed through touch it was not a weapon. His subsequent order to "take that out" was an investigatory search for evidence, not a protective search for weapons.

## C. False Arrest

192. **Legal Standard.** An arrest without probable cause violates the Fourth Amendment. Probable cause requires facts sufficient to warrant a prudent person to believe a crime has been committed.

193. **Absence of Probable Cause.** At the moment of arrest, Pedroza possessed no lawful evidence of a crime:

- **Fruit of the Poisonous Tree:** The pills and baggies were discovered solely through the unlawful stop extension and warrantless pocket searches described above. This evidence cannot establish probable cause.

- **Fabricated Hiding:** The "hiding movements" narrative was fabricated (as detailed in Claim 4) and cannot support probable cause.

46

Civil Action No. 7:25-cv-00393

- **Physical Impossibility:** Pedroza claimed to see a "bulge" in the back pocket of a seated driver from the opposite side of the car—a physical impossibility that cannot support probable cause.

194. **Defeat of Qualified Immunity.** The right to be free from warrantless searches absent reasonable suspicion was clearly established. No reasonable officer would believe that: (1) extending a stop by opening a vehicle door without observing *any* contraband or possessing reasonable suspicion was lawful; (2) commanding a suspect to reach into pockets was a valid *Terry* tactic; or (3) fabricating "hiding" claims to support an arrest was constitutional. Pedroza's systematic pattern of using these exact tactics (despite prior judicial rejections) demonstrates he acted with clear notice that his conduct was unlawful.

## VII. SECOND CLAIM FOR RELIEF

**Fourth Amendment—Unlawful Pretrial Detention (Fabrication of Evidence)**

**(Against Individual Defendant Pedroza)**

195. Plaintiff incorporates all preceding paragraphs.

196. **Legal Standard.** The Fourth Amendment prohibits pretrial detention based on fabricated evidence, even after legal process (magistration) has begun. Legal process does not extinguish a Fourth Amendment claim when the process itself is corrupted by an officer's knowing lies. *Manuel v. City of Joliet*, 580 U.S. 357 (2017).

197. **Corruption of Legal Process.** Plaintiff's pretrial detention from January 21, 2023 (post-magistration) through January 30, 2023 violated the Fourth Amendment because the judicial determination of probable cause was fatally tainted by Defendant Pedroza's intentional fabrications.

198. **The Poisoned Affidavit.** The Probable Cause Affidavit presented to the magistrate relied entirely on the "hiding movements" narrative to establish the link between Plaintiff and the contraband. As established in the Factual Allegations, this narrative was:

- **Manufactured:** Created via camera manipulation and temporal distortion;
- **Contradicted:** Disproven by synchronized dashcam footage showing compliant hands; and

47

Civil Action No. 7:25-cv-00393

- **Impossible:** Relying on the observation of a "bulge" from a vantage point where it was physically invisible.

199. **But-For Causation.** But for these specific fabrications, the magistrate would not have found probable cause to detain Plaintiff. The fabrication was the "moving force" that transformed a traffic stop into an eleven-day incarceration.

200. **Damages.** As a direct result of this fabrication-induced detention, Plaintiff suffered eleven days of loss of liberty, forced medication withdrawal from prescribed Nardil, and the psychological trauma of being jailed based on a demonstrable lie.

## VIII.  THIRD CLAIM FOR RELIEF

**Fourth Amendment—Unlawful Pretrial Detention (Total Absence of Probable Cause)**

**(Against Individual Defendant Pedroza)**

201. In the alternative to the Second Claim, Plaintiff incorporates all preceding paragraphs.

202. **Legal Standard.**  A seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution, or if the probable cause dissipates. Detention based solely on the "fruit of the poisonous tree" constitutes a Fourth Amendment violation. *Wong Sun v. United States*, 371 U.S. 471 (1963).

203. **Total Absence of Probable Cause.**  Even setting aside the allegations of fabrication, Plaintiff's detention was unlawful because every piece of evidence supporting the Probable Cause Affidavit was obtained through prior unconstitutional acts:

- The initial detention was unlawfully extended at 3:02 (door open) without reasonable suspicion;

- The pocket search at 3:50 was a warrantless search without a valid *Terry* justification (as established by the "empty your own pockets" contradiction);

- The "bulge" discovery at 5:30 resulted from an unlawful physical palpation of a soft object that clearly was not a weapon.

48

204. **Fruit of the Poisonous Tree.** Because the search of Plaintiff's person and vehicle violated the Fourth Amendment (as alleged in Claim 1), any evidence seized—including the pills and baggies—constituted "fruit of the poisonous tree." This evidence was legally void and could not form the basis for probable cause at the magistrate hearing.

205. **Void Ab Initio.** Consequently, the detention order issued by the magistrate was void *ab initio*. Regardless of Pedroza's intent (malice vs. mistake), the objective facts demonstrate a total absence of lawful probable cause to support the eleven-day detention.

206. **Damages.** Plaintiff suffered eleven days of unlawful incarceration because Defendant Pedroza initiated and prolonged a detention based on legally void evidence.

## IX.  FOURTH CLAIM FOR RELIEF

**Fourteenth Amendment Due Process Violation—Fabrication of Evidence**

**(Against Individual Defendants Pedroza and John Doe)**

207. Plaintiff incorporates all preceding paragraphs.

208. **Legal Standard.** The Fourteenth Amendment prohibits the deprivation of liberty resulting from the fabrication of evidence by a government officer. *Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000).

209. **Defendant Pedroza's Fabrications.** Defendant Pedroza deliberately fabricated material false statements knowing they would be used to justify Plaintiff's arrest. Specifically:

- **The "Hiding" Lie:** Fabricating "hiding movements" during the pre-search phase while utilizing the pre-angled camera blind spot to affirmatively shield his lies from visual disproof.

- **The "Bulge" Lie:** Fabricating the observation of a "bulge" in Plaintiff's back pocket from the opposite side of a seated driver—a physical impossibility.

- **The "Compliance-as-Resistance" Lie:** Fabricating that Plaintiff was "blading his body" and "attempting to hide" items, when video proves Plaintiff was actually complying with direct commands to "turn around" and "take that out."

Civil Action No. 7:25-cv-00393

- **The "Prescription" Lie:** Fabricating that Plaintiff had "prescription medication without a prescription" despite preventing Plaintiff from retrieving documentation from the glovebox and despite finding prescribed Nardil with a visible CVS label.

- **The "Weapon Fear" Lie:** Fabricating "weapon fears" to justify the "empty your pockets" command—a pretextual tactic used in eight prior cases. (In the case of Jesus Eduardo Lopez, Pedroza admitted this same tactic was used "in case of any contraband," revealing the true purpose).

- **The "Identification" Lie:** Fabricating that he "identified the driver" before the search, a claim contradicted by video timestamps showing identification occurred only after handcuffing.

210. **Defendant John Doe's Fabrication via Affirmative Adoption and Misrepresentation.** Defendant John Doe violated due process by mechanically incorporating Pedroza's fabrications into charging instruments and affirmatively misrepresenting evidence, thereby adopting the fabrications as his own:

- **The Seven-Month Investigatory Window:** Defendant Doe had a full seven months (January to August 2023) to perform the basic investigatory function of reviewing the evidence. His failure to verify despite this massive window transforms his filing into a **deliberate adoption and republication** of Pedroza's lies.

- **The Loperamide Fabrication:** Doe affirmatively misrepresented the evidentiary record by filing a charging instrument stating that Loperamide was a controlled substance. This was not a legal error but a factual misrepresentation of the laboratory report, which identified a legal over-the-counter medication.

- **Ignoring Institutional Knowledge:** Defendant Doe acted despite the office's institutional knowledge that Pedroza's reports contained identical "boilerplate" language used in over 20 prior prosecuted cases, many of which had resulted in dismissals or suppression hearings.

211. **Materiality.** The fabrications were material. Without Pedroza's false "hiding" narrative, there was no probable cause for the search. Without the incorporation of these lies, no charges could have been sustained.

50

212. **Deliberate Intent.** Defendants acted with deliberate intent or reckless disregard. Pedroza's systematic pattern, evolution of tactics following suppression hearings, and admission of potential job loss prove knowing fabrication. John Doe's failure to verify despite institutional knowledge spanning 23 cases with identical scripts, multiple dismissals, and judicial findings of lack of probable cause demonstrates at minimum reckless indifference.

213. **Causation.** The fabrications directly caused Plaintiff's deprivation of liberty: eleven days of jail detention, forced medication withdrawal, and a year-long prosecution ending in dismissal.

## X. FIFTH CLAIM FOR RELIEF

**Fourth Amendment Violation—Malicious Prosecution**

**(Against Individual Defendants Pedroza and John Doe)**

214. Plaintiff incorporates all preceding paragraphs.

215. **Specific Allegation Regarding Defendant John Doe's Identity:** Plaintiff has named "John Doe" as the Assistant District Attorney responsible for this claim. Plaintiff has exercised due diligence to ascertain Defendant's true name, but the signature on the charging instrument is illegible. Plaintiff will amend this Complaint to substitute the true name immediately upon identification through initial disclosures or discovery.

216. **Legal Standard.** To prove Malicious Prosecution under the Fourth Amendment, Plaintiff must show: (1) commencement of proceedings; (2) lack of probable cause; (3) malice; and (4) favorable termination. *Thompson v. Clark*, 596 U.S. 36 (2022).

217. **Commencement:** Defendant Pedroza initiated proceedings through his fabricated affidavit. Defendant John Doe commenced proceedings by filing the Criminal Complaint on August 31, 2023.

218. **Lack of Probable Cause:**

- **Loperamide Charge:** There was a total absence of probable cause. Loperamide is an over-the-counter medication (Imodium) and is not a controlled substance.

51

Civil Action No. 7:25-cv-00393

- **Fabricated Evidence Charge:** The remaining charges rested on Pedroza's "hiding movements" narrative, which is contradicted by synchronized video evidence and physical impossibility.

219. **Malice (Pedroza):** Defendant Pedroza acted with malice by knowingly fabricating probable cause and initiating criminal proceedings he knew were unsupported:

- Pedroza deliberately pre-angled his bodycam downward to conceal Plaintiff's compliant conduct, then falsely swore Plaintiff made "hiding movements" — conduct directly contradicted by dashcam footage and his own 36:22 admission in the patrol car.

- Pedroza employed this identical "empty pockets + hiding" script in at least eight prior cases, many of which resulted in dismissals or suppression for lack of probable cause, demonstrating he knew the tactic manufactured rather than discovered probable cause.

- Pedroza's real-time verbal gaslighting, temporal manipulation in reports, and physical palpation of a soft baggie before claiming "weapon fears" show he acted with intent to deprive Plaintiff of liberty without justification, not mere mistake.

The systematic, decade-long pattern of identical fabrications across 26 unrelated arrests further evidences Pedroza's malicious intent to prosecute citizens without regard for the truth.

220. **Malice (John Doe):** Defendant John Doe acted with malice through deliberate indifference and reckless disregard for the truth:

- **Seven-Month Delay:** Doe waited seven months between arrest and filing. This was not a "snap judgment" but a prolonged investigatory failure. He had ample time to perform the basic administrative task of verifying the lab report against the statute.

- **Ignoring Institutional Knowledge:** Doe's office had prosecuted 20+ Pedroza cases, including multiple dismissals and suppressions. Doe ignored this pattern and filed charges without reviewing the video that would have exposed Pedroza's lies.

- **The Loperamide Flag:** The lab report explicitly identified the substance as Loperamide. Filing a criminal charge for possessing over-the-counter medication demonstrates a level of reck-

52

lessness that equates to malice.

221. **Favorable Termination.** All charges were dismissed on February 1, 2024.

222. **Damages.** Plaintiff suffered a panic attack in Pedroza's patrol car, **a syncopal episode (fainting) requiring emergency hospitalization during booking,** eleven days incarceration, forced medication withdrawal, emotional distress, an **Unspecified Trauma and Stressor-Related Disorder (UTSRD)** diagnosis, reputational harm, required court appearances, anxiety regarding potential conviction, damage to relationships, financial burden of legal defense, and psychological trauma as direct results of the prolonged prosecution from August 31, 2023, through February 1, 2024.

223. **Immunity Defenses Defeated.** Defendant John Doe is not entitled to absolute immunity because his pre-filing actions constituted investigatory functions, including evidence screening, statutory verification, and laboratory review, rather than purely prosecutorial advocacy. Nor is he entitled to qualified immunity, as the right to be free from baseless charges based on unverified or fabricated evidence was clearly established, and no reasonable prosecutor could believe that failing to verify over seven months was lawful.

## XI. SIXTH CLAIM FOR RELIEF

**Fourth Amendment Violation—Affirmative Participation in False Arrest**

**(Against Individual Defendant Alberto Moreno)**

224. Plaintiff incorporates all preceding paragraphs.

225. **Legal Standard (Direct Liability).** An officer violates the Fourth Amendment when they affirmatively participate in the seizure of a citizen by knowingly or recklessly contributing to, directing, or facilitating the submission of false arrest documentation. Liability extends to any official whose affirmative conduct is a "moving force" behind the presentation of false probable cause. *Hughes v. Garcia*, 97 F.4th 355, 363 (5th Cir. 2024).

226. **Affirmative Participation (The Gatekeeper Act).** Defendant Moreno affirmatively participated in the violation of Plaintiff's Fourth Amendment rights. His role was not passive supervision; he

personally reviewed and signed the arrest report. Under DPS procedure, his signature was the nec-essary "gatekeeper" act that authorized the report's submission and the continuation of Plaintiff's detention. By signing, Moreno transformed the draft report into the official operative document used to justify the seizure.

227. **Reckless Disregard via Statistical Impossibility.** Moreno acted with reckless disregard for the truth by validating a report he had reason to know contained fabricated assertions. Between May 2021 and January 2023, Moreno approved at least eight arrest reports containing verbatim identical scripts for unrelated suspects arrested on different dates for different violations:

- **Identical Fabricated Scripts:** Seven reports contained the identical command directing sus-pects to "empty their own pockets" despite articulated weapon fears—a physical impossibility contradicting basic officer safety. Multiple reports described different suspects using identical physiological language ("nervous," "swallowing," "hands shuffling"). The verbatim identi-cal language across eight unrelated cases proves these were scripted fabrications, not genuine observations.

- **Statistical Impossibility:** Eight strangers arrested on different dates for different violations could not have displayed identical behavioral patterns described in identical language. This put Moreno on notice that the narratives were fabricated.

228. **Knowledge via Pattern of Personal Approvals.** Moreno's participation was knowing, not negli-gent. His knowledge that Pedroza's reports contained fabrications is established by his own conduct: approving eight reports containing verbatim identical scripts over a thirteen-month period. Each successive approval with identical language provided cumulative notice that these were not gen-uine observations but scripted fabrications. Additionally, DPS had institutional notice from Phase 1 dismissals and suppression hearings (2019–2021) involving Pedroza's reporting tactics, including cases dismissed for lack of probable cause and cases involving facially unconstitutional admissions. By continuing to approve identical scripts despite both his personal pattern of approvals and in-stitutional notice, Moreno acted with reckless disregard for the truth and knowing participation in fabrications when he approved Plaintiff's substantially similar report.

229. **Direct Causation.** Moreno's signature was a "but-for" cause of Plaintiff's prolonged detention. Had he refused to sign the deficient report—as his duty required given the obvious fabrications—the false probable cause would not have been presented to the magistrate.

230. **Not Respondeat Superior.** Moreno is liable for his own constitutional violation—personally approving and authorizing false reports—not vicariously liable for Pedroza's misconduct. Each approval constituted Moreno's personal participation in presenting false probable cause.

231. **Qualified Immunity Does Not Apply.** The law has been clearly established that officers violate the Fourth Amendment when they knowingly or recklessly participate in the submission of false arrest documentation. *Franks v. Delaware*, 438 U.S. 154 (1978). Moreno falls within the category of officials who "knowingly violate the law" and are therefore not entitled to qualified immunity. His conduct was not a reasonable mistake but knowing participation in fabricated reports, demonstrated by:

   • Verbatim identical scripts across eight unrelated suspects arrested on different dates for different violations;

   • Physical impossibility of the "empty pockets for weapons" scenario in seven cases;

   • Statistical impossibility of identical behavioral patterns described in identical language;

   • Institutional notice from Phase 1 dismissals involving Pedroza's tactics;

   • Thirteen months of repeated approvals demonstrating pattern, not isolated error; and

   • Eight separate approvals proving continuous conscious choice to validate fabrications.

232. No reasonable official could believe it lawful to approve eight reports containing verbatim scripted narratives and physical impossibilities over thirteen months. Moreno's conduct was objectively unreasonable and involved knowing participation in Fourth Amendment violations.

233. Defendant Moreno is not entitled to qualified immunity.

## XII.  SEVENTH CLAIM FOR RELIEF

**Municipal Liability**

**(42 U.S.C. § 1983 Against Toribio Palacios in Official Capacity)**

234. Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

235. Defendant Toribio Palacios is sued in his official capacity as District Attorney for Hidalgo County, Texas, as the final policymaker for the Hidalgo County District Attorney's Office.

236. A municipality may be held liable under § 1983 when a constitutional violation results from an official custom or practice that was the moving force behind the violation.

237. **The "Blind Filing" Customs.**  The Hidalgo County District Attorney's Office maintained five distinct, widespread customs that collectively operated to insulate fabricated police reports from scrutiny. These customs were the moving force behind Plaintiff's injuries:

  (a) **Custom of Blind Filing (No Video Review):** The Office maintained a practice of filing charges based on officer narratives (e.g., "hiding movements") without reviewing available dashcam or bodycam evidence.  This custom allowed Pedroza's fabricated "hiding" claims to pass into a charging instrument despite the office possessing video that showed Plaintiff's hands were visible and compliant.

  (b) **Custom of No Officer Credibility Tracking:** Despite prosecuting over 20 Pedroza cases spanning eight years (2017–2024), the Office maintained no system to flag officers with histories of dismissals or suppression hearings.

  (c) **Custom of No Cross-Case Pattern Analysis:** The Office failed to cross-reference case files, allowing Pedroza to use verbatim identical scripts (e.g., "odor emitting," "empty pockets") across 26 cases without detection.

  (d) **Custom of Charging Without Statutory Verification:** The Office maintained a practice of filing controlled substance charges based on laboratory reports without verifying that the identified substance is actually listed in the Texas Penalty Groups. In this case, the office possessed

Civil Action No. 7:25-cv-00393

a laboratory report explicitly identifying the substance as Loperamide (an over-the-counter medication), yet filed charges treating it as a controlled substance because the custom permitted filing without verifying the substance's legal status against the statute.

(e) **Custom of Mechanical Incorporation:** The Office mechanically incorporated police reports into charging instruments without independent verification of key factual claims, internal consistency, or basic plausibility.

238. **Knowledge via Institutional Notice.** The Office had actual knowledge that Pedroza's arrests were constitutionally deficient, yet acted with deliberate indifference. This knowledge is proven by the Office's own decisions to **decline prosecution** in the cases involving *Nicholas Joe Rodriguez* (May 2021) and *Roel Medina* (September 2022) due to evidentiary deficiencies. These declinations demonstrate that the Office affirmatively recognized Pedroza's stops lacked sufficient basis, yet failed to implement any tracking system to flag his future cases (like Plaintiff's).

239. **Deliberate Indifference to Ongoing Pattern.** The Office's deliberate indifference is further evidenced by the fact that the pattern continued even after Plaintiff's case was dismissed. In November 2023, the Office prosecuted the case of *Lisa Southerland* based on Pedroza's same "odor of marihuana" script. That case was dismissed in February 2025 with an explicit judicial finding of "Lack of probable cause." This post-dismissal continuation demonstrates that the "Blind Filing" customs remain systemic and ongoing.

240. **Corroboration via The "August 2023 Nexus" (The 19-Day Window).** The DA's deliberate indifference is definitively proven by the Office's conduct toward Plaintiff during the specific timeframe relevant to this suit.

- On August 31, 2023, the Office rubber-stamped the Pedroza charges (Loperamide/Fabrication) without verification.

- On September 18, 2023—**only 19 days later**—the Office rubber-stamped the McAllen PD charges (Assault) in a separate matter (see *Alanis v. Lozano, et al.*, Civil Action No. 7:25-cv-00443, S.D. Tex.).

- This second rubber-stamping occurred despite obvious red flags detailed in Section V.7.6, including:

  (a) **Facial Invalidities (Incompetence):** The reports admitted on their face that the arrest preceded the investigation and that forensic evidence (minimal blood) contradicted the charge ("prolonged violent assault"). The Office's failure to spot these contradictions proves the "Blind Filing" custom.

  (b) **Active Suppression of Evidence (Malice):** Most damningly, the Office proceeded with the indictment while **withholding exculpatory video evidence** (the interrogation and complainant statement) that was in its actual possession. This demonstrates that the custom extends beyond mere negligence ("Blind Filing") to the deliberate suppression of objective evidence that contradicts police narratives.

The fact that the Office mechanically incorporated two facially deficient reports against the same Plaintiff, originating from two different agencies (DPS and McAllen PD), within a single 19-day window demonstrates that the "Blind Filing" custom is not limited to specific officers but is the standard operating procedure for the entire Office. This total abandonment of the investigatory screening function—combined with the active suppression of contradictory evidence—constitutes deliberate indifference to the known risk of baseless prosecutions.

241. **Causation.** These customs were the moving force behind and direct cause of the constitutional violations.

- **Fabrication Charge:** The "Blind Filing" custom caused the incorporation of fabricated observations that a simple video review would have disproven.

- **Loperamide Charge:** The "Charging Without Statutory Verification" custom caused the facially invalid Loperamide charge. Had the Office verified the laboratory result against the statute—a ministerial task—the charge would never have been filed.

Collectively, these customs established a systematic practice that made constitutional violations inevitable.

Civil Action No. 7:25-cv-00393

242. **Harms and Charge Specificity.** As a direct and proximate result of these customs, Plaintiff suffered deprivation of his Fourth Amendment right to be free from malicious prosecution. Under *Chiaverini v. City of Napoleon*, 602 U.S. ___ (2024), each charge lacked probable cause independently as a result of these customs. The Office is liable for the distinct harms arising from the facially invalid Loperamide charge—specifically, the anxiety and stigma resulting from the artificial inflation of Plaintiff's criminal liability through "charge stacking"—and the underlying fabricated probable cause (unlawful detention).

243. Defendant Palacios, as the final policymaker for the District Attorney's Office, is liable in his official capacity for the constitutional violations caused by these customs and practices.

## XIII.  EIGHTH CLAIM FOR RELIEF

**Fourth Amendment—Charge-Specific Liability (Loperamide)**

**(Against Defendant John Doe, Assistant District Attorney, Individual Capacity)**

244. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

245. **Charge-Specific Analysis:** Under *Chiaverini v. City of Napoleon*, 602 U.S. ___ (2024), a Fourth Amendment malicious prosecution claim is charge-specific. The presence of probable cause for one charge does not categorically defeat a claim based on another baseless charge. Plaintiff brings this claim specifically regarding the Loperamide charge.

246. **The Facially Void Charge:** On August 31, 2023, Defendant John Doe filed a complaint charging that Plaintiff:

> "did then and there intentionally and knowingly possess a controlled substance, namely, a material, compound, mixture, or preparation in an amount of less than 28 grams, that contained a quantity of Loperamide."

This charge alleges a non-crime. Loperamide is Imodium. It is available off the shelf. It is not listed in Texas Health & Safety Code §§ 481.102–105 or Federal Schedules.

247. **Investigatory Failure (Not Advocacy):**

Civil Action No. 7:25-cv-00393

- Defendant Doe's error was not a mistake of legal judgment or statutory interpretation. It was a failure to perform the basic investigatory function of verifying the factual identity of the substance against the clear text of the law.

- During the seven-month period prior to filing, Doe acted as an investigator. His duty was to determine *if* a crime had occurred. By failing to cross-reference the lab report with the Penalty Groups—a ministerial administrative task—he failed to establish the existence of a crime before initiating the prosecution.

248. **Malice and Deliberate Indifference:** The filing of this charge was not mere negligence. The lab report clearly stated "Loperamide." The statute clearly excludes it. For a prosecutor to charge possession of an over-the-counter stomach medication as a controlled substance after a seven-month investigation requires a reckless disregard for the truth so egregious that it shocks the conscience.

249. Defendant John Doe's reckless disregard is further evidenced by the office's institutional knowledge from prosecuting Pedroza cases over seven years, including multiple dismissals and judicial findings of lack of probable cause. Despite this notice that Pedroza's reports required independent verification, Doe mechanically incorporated the loperamide charge without the minutes of verification required to confirm the substance's legal status.

250. **Causation of Harm:** The Loperamide charge was not merely "tacked on"; it independently justified detention, bail conditions, and the stigma of being labeled a drug offender facing multiple counts. By charging a non-crime as a controlled substance offense, Defendant Doe artificially inflated Plaintiff's criminal exposure, causing specific, distinct anxiety regarding the cumulative weight of stacked charges and a second potential conviction—harm that was objectively baseless and would not have existed had Defendant Doe performed the ministerial task of verifying the substance.

251. **Defeat of Immunity Defenses:**

- **No Absolute Immunity:** Doe was performing an investigatory/administrative function (screening evidence for probable cause) when he failed to verify the substance. Since no probable cause existed (as the act was legal), the "advocacy" phase had not lawfully begun.

- **No Qualified Immunity:** The right not to be prosecuted for lawful behavior—specifically, possessing legal medicine—is the most clearly established right imaginable. There is no ambiguity in the statute regarding Loperamide; it simply isn't there. No "reasonable mistake of law" defense applies to charging a non-crime.

252. This claim is timely filed and Plaintiff demands judgment against Defendant John Doe in his individual capacity.

### XIV.  JURY DEMAND

Plaintiff demands trial by jury on all claims so triable.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

MCALLEN DIVISION

**Angel Adalberto Alanis**,

    Plaintiff,

v.

**Trooper Pablo Pedroza, et al.**,

    Defendants.

Civil Action No. 7:25-cv-00393

**Continuation of Section IV – Injuries**

253. As a direct and proximate result of Defendants' constitutional violations, including the unlawful arrest without probable cause, evidence fabrication, failure to intervene, and municipal and prosecutorial customs, Plaintiff sustained the following injuries and damages:

# I. Economic Damages

- **Future Earning Capacity - Permanent Diminishment:** The false arrest created a permanent arrest record that appears on commercial background check databases, employer screening systems, and internet searches. This permanent digital record has destroyed Plaintiff's capacity to compete equally in the labor market for the remainder of his working life. Plaintiff had demonstrated earning capacity of $50,000+ annually through two documented job offers, reflecting his education, skills, and qualifications. The arrest record now subjects Plaintiff to systematic employment discrimination regardless of his actual qualifications, as employers use automated screening that eliminates candidates with arrest records before human review occurs. This represents a

1

permanent reduction in Plaintiff's lifetime earning capacity, the present value of which will be established through expert testimony from vocational rehabilitation specialists and economists, estimated to exceed $200,000 and potentially substantially more depending on Plaintiff's age and career trajectory;

- **Ongoing Inability to Pass Employment Background Checks:** Plaintiff continues to face immediate disqualification from employment opportunities when background checks reveal the arrest and resulting prosecution. Under *Manuel v. City of Joliet*, 580 U.S. 357 (2017), the unlawful arrest that initiated this chain of events remains actionable despite the subsequent dismissal, as the arrest created the criminal record and coercive circumstances that led to a year-long prosecution. The permanent criminal record stemming from the unlawful arrest continues to cause ongoing employment discrimination and economic harm;

- **Legal Fees and Costs:** All legal fees and costs incurred defending against the fabricated criminal charges stemming from the unlawful arrest;

- **Past Medical and Mental Health Treatment Costs:** All costs for mental health treatment, counseling, therapy, psychiatric care, and medications related to trauma from the unlawful arrest, evidence fabrication, forced medication withdrawal, and prolonged detention;

- **Future Medical and Mental Health Treatment Costs:** Ongoing and future costs for mental health treatment, counseling, therapy, psychiatric care, medications, and other medical care necessitated by the permanent psychological injuries caused by Defendants' conduct, the amount to be established through expert medical testimony;

- **Costs Related to Forced MAOI Withdrawal:** Medical evaluations, treatment, and monitoring necessitated by the abrupt forced withdrawal from prescribed MAOI medication (Nardil/phenelzine), including assessments for persistent MAO inhibitory effects, potential neurocognitive impairments, physiological complications, and altered

medication response patterns;

- **Loss of Use and Permanent Loss of Vehicle:** Economic damages for the permanent deprivation of Plaintiff's vehicle resulting from the unlawful arrest, including the fair market value of the 2021 Kia K5 at the time of seizure, the value of all equity accrued, reimbursement for monthly payments made during the period of deprivation, and all associated costs including towing, storage, and impound fees;

## II. Non-Economic Damages

- **Loss of Liberty:** 11 days of unlawful detention from January 20 to January 30, 2023;
- **Physical Pain and Suffering:** Severe physical pain and suffering during the 11-day detention including:
  - Acute withdrawal symptoms from forced abrupt cessation of prescribed MAOI medication (Nardil/phenelzine) without medical supervision or proper tapering, including restlessness, anxiety, depression, confusion, hallucinations, headache, weakness, diarrhea, tachycardia, hypotension, convulsions, respiratory depression, sluggish reflexes, pyrexia (fever), diaphoresis (sweating), and risk of more severe effects including coma or clinical worsening of depression;
  - Fainting incident at jail requiring hospital transport and evaluation, caused by the stress and conditions of unlawful detention;
  - Physical discomfort and suffering from detention conditions including exposure to extreme cold temperatures, scalding hot shower water, constant noise, 24-hour lighting, overcrowding, and sleep deprivation;
  - Ongoing physical manifestations of psychological trauma including tension, headaches, gastrointestinal distress, and somatic symptoms;
- **Mental Anguish and Emotional Distress:** Severe and ongoing mental anguish, emotional distress, and psychological trauma including:

- – Terror, fear, and anxiety during the arrest, transportation, booking, and detention;

- – Panic attack caught on bodycam in patrol car during transport, triggered by the terror of the arrest and detention;

- – Psychological suffering compounded by knowledge that the arrest was based on fabricated evidence and that the system mechanically rubber-stamped the false charges;

- – Anxiety, depression, hypervigilance, intrusive thoughts, nightmares, and flash-backs;

- – Fear of future interactions with law enforcement;

- – Ongoing emotional distress from the permanent arrest record and its continuing consequences;

- – Diagnosed Unspecified Trauma and Stressor Related Disorder directly caused by or significantly exacerbated by the trauma of the unlawful arrest, evidence fabrication, prosecutorial misconduct, and 11-day detention;

- **Humiliation, Embarrassment, and Degradation:** Severe humiliation and degradation from:

  - – The public nature of the arrest;

  - – The booking process and treatment as a criminal based on fabricated charges;

  - – Being forced to disclose the arrest to potential employers, with resulting shame and loss of dignity;

  - – Ongoing stigma and embarrassment in the community;

- **Reputational Harm in the Digital Age:** Permanent and ongoing reputational harm from the arrest record appearing on:

  - – Commercial background check databases accessed by employers;

  - – Public court record databases and websites;

  - – Internet search results linking Plaintiff's name to the false arrest;

4

– Each future job application representing a new reputational injury requiring disclosure or explanation;

– Permanent digital scarlet letter that follows Plaintiff for life;

• **Permanent Employability Stigma - Dignitary Harm:** Beyond the pure economic loss of earning capacity, Plaintiff suffers ongoing dignitary harm from being permanently branded as an arrested person in the employment marketplace, including:

– Loss of equal standing and dignity in pursuing career advancement;

– Shame and humiliation of explaining the false arrest in every job interview;

– Loss of professional identity and self-worth from systematic employment discrimination;

– Psychological burden of checking disclosure boxes and knowing automatic disadvantage;

– Permanent second-class status in the labor market despite equal or superior qualifications;

• **Loss of Enjoyment of Life:** Significant and ongoing loss of enjoyment of life, inability to engage in previously enjoyed activities, disruption of daily activities and routines, and diminished quality of life resulting from the psychological trauma;

## III. Enhanced Harm from Vulnerable Victim Status

254. Plaintiff is currently undergoing comprehensive psychological evaluation for autism spectrum disorder and related conditions, a process involving months of standardized assessment, developmental history review, and multi-domain observation by qualified diagnosticians. Regardless of the ultimate diagnostic label, Plaintiff exhibited observable sensory processing difficulties and heightened vulnerability to the detention conditions that jail staff could and should have observed and accommodated. These functional limitations caused Plaintiff

to experience objectively greater harm from conditions that neurotypical individuals would tolerate without comparable distress.

255. Medical research establishes that individuals with sensory processing disorders, including those on the autism spectrum, commonly experience sensory sensitivities (53-95% prevalence) that cause objectively measurable neurological responses to stimuli that neurotypical individuals tolerate without distress. Such individuals are documented to have four times higher rates of post-traumatic stress disorder than the general population, and adverse events that would not traumatize neurotypical individuals can be experienced as physically traumatic due to neurological differences in sensory processing thresholds.

256. The conditions Plaintiff endured during the 11-day unlawful detention, combined with Plaintiff's observable sensory processing vulnerabilities, constituted what medical experts would characterize as continuous sensory assault, including:

- **Extreme Temperature Dysregulation:** Exposure to extreme cold temperatures in the detention facility that Hidalgo County Jail is widely known for maintaining, combined with scalding hot water in showers, creating constant thermal distress that individuals with sensory processing differences experience more acutely due to neurological processing variations;

- **Constant Auditory Assault:** Unrelenting noise from other detainees, facility operations, television playing from 8:00 AM daily, and people talking continuously until well into the morning hours, with no quiet space or respite, causing what individuals with auditory sensitivities experience as physical pain when neurological thresholds are exceeded;

- **24-Hour Lighting and Sleep Deprivation:** Constant artificial lighting throughout the night preventing normal sleep cycles, which courts have recognized as violating constitutional standards and which causes exponentially greater harm to individuals with sensory sensitivities and processing differences;

6

- **Overcrowding and Unpredictability:** Dense population creating constant sensory overwhelm from proximity, touch, smells, and unpredictable environment changes that individuals with sensory processing difficulties cannot habituate to due to neurological processing differences;

- **Lack of Accommodations:** Complete failure to provide any accommodations for observable sensory processing difficulties despite the Americans with Disabilities Act requiring reasonable accommodations in detention facilities (42 U.S.C. § 12132; *Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206 (1998));

257. These conditions, while harsh for any detainee, constituted what experts characterize as "sensory torture" for individuals with significant sensory processing vulnerabilities. The combination of multiple simultaneous sensory assaults compounded rather than merely added together, creating a continuously traumatic experience throughout the entire 11-day period. This sensory trauma contributed directly to Plaintiff's diagnosed Trauma and Stressor Related Disorder and ongoing psychological injuries.

258. The pending nature of formal diagnostic evaluation does not bar recovery for these enhanced damages. The Americans with Disabilities Act protects functional limitations regardless of formal diagnostic labels, and what matters for constitutional purposes is that symptoms and sensory sensitivities were observable and required accommodation. The jail had constructive notice of Plaintiff's vulnerability through observable behaviors during intake and detention. The failure to provide simple accommodations—quieter housing, lighting modifications, temperature control—despite observable sensory issues constitutes a departure from the standards mandated by Title II of the ADA, further evidencing deliberate indifference under the Fourteenth Amendment.

259. As a vulnerable individual experiencing objectively more severe harm from identical conditions that neurotypical detainees would endure, Plaintiff's pain and suffering damages are proportionally increased. This "vulnerability multiplier" effect is recognized in tort law and

§ 1983 jurisprudence where identical conditions cause greater harm to plaintiffs with partic-
ular vulnerabilities. Medical literature establishes that individuals with sensory processing
disorders and related conditions have significantly elevated likelihood of developing PTSD
from traumatic events compared to general population rates, demonstrating both greater im-
mediate suffering and higher risk of permanent psychological injury.

## IV. Aggravated Harm from Forced MAOI Withdrawal

260. The forced abrupt withdrawal from Nardil (phenelzine), a monoamine oxidase inhibitor
(MAOI) antidepressant, without medical supervision or proper tapering, significantly ex-
acerbated Plaintiff's suffering during the unlawful detention and constitutes aggravating cir-
cumstances increasing damages.

261. MAOIs are fundamentally different from other antidepressants in both their mechanism of
action and discontinuation requirements:

- MAOIs work by irreversibly inhibiting monoamine oxidase enzymes in the brain, re-
quiring the body to regenerate new enzymes over weeks to months before normal brain
chemistry can resume;

- MAO inhibitory effects persist for 10-14 days or more after the last dose is taken,
creating ongoing risks even after the drug is cleared from the body;

- MAOIs are prescribed only as last-line treatment after other antidepressants have failed,
signaling treatment-resistant depression requiring specialized care;

- The FDA-approved prescribing information for Nardil explicitly warns that discontin-
uation should occur gradually over four or more weeks and never abruptly;

262. Medical literature documents severe MAOI withdrawal phenomena including, but not lim-
ited to: restlessness, anxiety, depression, confusion, hallucinations, headache, weakness, di-
arrhea, agitation, pressured speech, sleeplessness, delirium, paranoid psychosis, movement

disorders, tachycardia, hypotension, convulsions, respiratory depression, sluggish reflexes, pyrexia (fever), diaphoresis (sweating), thrombocytopenia, insomnia, and potential for coma or clinical worsening of depression. These symptoms resemble those produced by discontinuation of psychostimulants and can be life-threatening without proper medical supervision.

263. Plaintiff's prescription for Nardil established both prongs of the deliberate indifference test applicable to pretrial detainees under the Fourteenth Amendment (applying standards from *Estelle v. Gamble*, 429 U.S. 97 (1976) and *Farmer v. Brennan*, 511 U.S. 825 (1994)):

- An objectively serious medical need existed—treatment-resistant depression requiring last-line MAOI medication is inherently serious, and abrupt MAOI cessation creates substantial risk of severe withdrawal syndrome and suicide risk;

- Defendants had actual or constructive notice through any intake screening or medical records showing prescribed medication, yet deliberately disregarded the substantial risk of serious harm by denying continuation or proper tapering;

264. The forced MAOI withdrawal caused Plaintiff to actually suffer the severe physical and psychological withdrawal symptoms described above and documented in medical literature throughout a significant portion of the 11-day detention, compounding the trauma of the false imprisonment itself. The withdrawal period coincided with a time of extreme vulnerability when Plaintiff most needed psychiatric medication support.

265. Long-term consequences of abrupt MAOI cessation include potential permanent alterations in medication effectiveness, persistent changes to brain chemistry requiring months to years to normalize, increased risk of future medication resistance, and ongoing neurocognitive or physiological impairments requiring continued medical evaluation and monitoring.

## V. Reservation of Rights for Developing Injuries

266. Plaintiff is currently undergoing comprehensive evaluation for autism spectrum disorder, with evaluation scheduled and expected to require approximately one to three months per standard diagnostic protocols involving multiple assessment sessions, standardized testing instruments, developmental history compilation, and multi-domain behavioral observation. The full extent of Plaintiff's injuries caused by Defendants' constitutional violations is not yet fully known pending completion of this evaluation and potential identification of additional trauma-related conditions.

267. Plaintiff expressly reserves the right, pursuant to Federal Rules of Civil Procedure 15(a) and (d), to supplement or amend this Complaint to add or specify additional medical, psychological, and financial injuries and resulting damages as they are discovered through ongoing evaluation and as additional diagnoses relating to Defendants' conduct are confirmed. This reservation specifically includes but is not limited to:

- Formal autism spectrum disorder diagnosis and all associated enhanced damages from sensory trauma during detention;

- Additional psychological or psychiatric diagnoses causally related to the unlawful arrest, evidence fabrication, and forced medication withdrawal;

- Long-term medical complications from abrupt MAOI withdrawal as they manifest and are documented;

- Future medical and psychological treatment costs as treatment plans are developed and prognoses established;

- Additional economic losses as ongoing employment difficulties and career impacts are further documented;

- Any other damages, injuries, or losses revealed through continued medical evaluation, discovery, expert analysis, or proven at trial;

10

268. Plaintiff will act promptly to amend this Complaint upon receipt of formal diagnostic findings and will provide defendants immediate notice of any additional injuries discovered. All such amendments will relate back to the original filing date pursuant to Fed. R. Civ. P. 15(c)(1)(B) as they arise from the same conduct, transaction, and occurrence alleged in this Complaint—the unlawful arrest, evidence fabrication, and prolonged detention from January 20 to January 30, 2023.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

MCALLEN DIVISION

**Angel Adalberto Alanis**,

Plaintiff,

v.

**Trooper Pablo Pedroza, et al.**,

Defendants.

Civil Action No. 7:25-cv-00393

### Continuation of Section V – Prayer for Relief

WHEREFORE, Plaintiff Angel Adalberto Alanis respectfully requests that this Court enter judgment in his favor and against Defendants, and award the following relief:

269. **Declaratory Relief:** A declaratory judgment pursuant to 28 U.S.C. § 2201 that:

- Defendant Trooper Pablo Pedroza violated Plaintiff's Fourth and Fourteenth Amendment rights by fabricating evidence to manufacture probable cause for unlawful traffic stop extension, warrantless searches, false arrest, and unlawful pretrial detention;

- Defendant Supervisor Alberto Moreno violated Plaintiff's Fourth Amendment rights by affirmatively participating in, enabling, and personally approving Pedroza's fabricated reports in this case and at least seven other patterned arrests;

- Defendant John Doe (Assistant District Attorney) violated Plaintiff's Fourth and Fourteenth Amendment rights by mechanically incorporating fabricated reports into charging documents without independent verification and by charging a non-crime (Loperamide possession), thereby prolonging unlawful detention;

1

- Defendant Toribio Palacios, in his official capacity as District Attorney, maintained customs and practices of rubber-stamping fabricated reports that caused or contributed to Plaintiff's prolonged unlawful detention;

270. **Compensatory Damages Against All Defendants, Jointly and Severally:**

## A. Economic Damages

- All legal fees and costs incurred defending against the fabricated criminal charges stemming from the unlawful arrest;

- Reimbursement for all medical, psychiatric, and therapeutic costs incurred as a direct result of Defendants' conduct, specifically including but not limited to: (1) expenses arising from the emergency hospital transport, evaluation, and treatment required after Plaintiff suffered a syncopal episode during the booking process on January 20, 2023; and (2) all other costs for counseling, therapy, and medications;

- All future medical expenses, mental health treatment costs, counseling, therapy, psychiatric care, medications, and related expenses necessitated by the permanent psychological and physical injuries caused by Defendants' conduct, to be established through expert medical testimony;

- All costs related to medical evaluation, treatment, and monitoring for complications from forced abrupt MAOI withdrawal;

- Loss of Use and Permanent Loss of Vehicle: Economic damages for the permanent deprivation of Plaintiff's vehicle resulting from the unlawful arrest, including the fair market value of the 2021 Kia K5 at the time of seizure, the value of all equity accrued, reimbursement for monthly payments made during the period of deprivation, and all associated costs including towing, storage, and impound fees;

- Ongoing economic losses from inability to obtain employment due to the permanent arrest record appearing on background checks;

2

- Future earning capacity - permanent diminishment: The present value of Plaintiff's permanently reduced lifetime earning capacity caused by the false arrest record that systematically disqualifies Plaintiff from employment opportunities for which he is otherwise qualified, to be established through expert testimony from vocational rehabilitation specialists and economists, estimated to exceed $200,000 and potentially substantially more;

## B. Non-Economic Damages

- Loss of liberty for 11 days of unlawful pretrial detention;
- Physical pain and suffering during the 11-day detention, including:
  - Severe withdrawal symptoms from forced abrupt cessation of prescribed MAOI medication (Nardil/phenelzine) without medical supervision;
  - Fainting incident at jail requiring hospital transport and evaluation, caused by the stress and conditions of unlawful detention;
  - Physical suffering from detention conditions including extreme temperatures, constant noise, 24-hour lighting, overcrowding, and sleep deprivation;
  - Enhanced physical suffering due to observable sensory processing differences that caused Plaintiff to experience objectively greater pain from detention conditions;
  - Ongoing physical manifestations of psychological trauma;
- Mental anguish, emotional distress, and psychological trauma, including:
  - Severe anxiety, depression, fear, and terror during arrest, detention, and continuing;
  - Panic attack caught on bodycam in patrol car during transport, triggered by the terror of the arrest and detention;
  - Diagnosed Unspecified Trauma and Stressor Related Disorder caused or exacerbated by Defendants' conduct;

3

- Enhanced psychological trauma due to observable sensory vulnerabilities, with individuals with such processing differences experiencing higher rates of PTSD than the general population;

- Psychological suffering from knowledge that arrest was based on fabricated evidence;

- Ongoing emotional distress from permanent arrest record and continuing consequences;

- Humiliation, embarrassment, and degradation from:

  - The public arrest and booking process;

  - Being branded as a criminal based on fabricated charges;

  - Requirement to disclose the false arrest to potential employers;

  - Ongoing stigma and shame in the community;

- Reputational harm in the digital age from permanent arrest record appearing on:

  - Commercial background check databases;

  - Public court records and online databases;

  - Each future employment application requiring disclosure;

- Permanent employability stigma and dignitary harm beyond pure economic loss, including:

  - Loss of equal standing and dignity in pursuing career advancement;

  - Shame of explaining false arrest in every job interview;

  - Loss of professional identity and self-worth;

  - Permanent second-class status in the labor market;

- Loss of enjoyment of life, inability to engage in previously enjoyed activities, and diminished quality of life;

- All other non-economic damages proven at trial;

4

271. **Nominal Damages:** In the alternative, should the Court or jury find that Plaintiff has proven violations of his constitutional rights but that specific compensatory damages have not been established with sufficient certainty, nominal damages of One Dollar ($1.00) to vindicate the constitutional deprivations and to establish Plaintiff as a prevailing party entitled to costs and attorneys' fees under 42 U.S.C. § 1988;

272. **Punitive Damages Against Individual Defendants in Their Individual Capacities:** Punitive damages against Defendants Trooper Pablo Pedroza, Supervisor Alberto Moreno, and John Doe (Assistant District Attorney), in their individual capacities, for their deliberate, reckless, and callous indifference to Plaintiff's clearly established constitutional rights, including:

   • Fabricating evidence to manufacture probable cause for unlawful arrest and detention;

   • Affirmatively participating in and personally approving fabricated reports in this case and at least seven other patterned arrests, demonstrating a systematic scheme of constitutional violations;

   • Mechanically incorporating fabricated evidence into charging without verification despite institutional knowledge of Pedroza's pattern, and recklessly filing controlled substance charges for possession of a non-controlled over-the-counter substance (Loperamide);

Such conduct was undertaken with reckless or callous indifference to Plaintiff's federally protected rights, or with evil motive or intent, warranting substantial punitive damages to punish this egregious misconduct and deter similar future violations. Given the exceptional reprehensibility—including intentional deception through a documented pattern of at least 26 substantially similar arrests (spanning Phase 1 and Phase 2, with shared script elements in marijuana-related cases)—harm to a vulnerable detainee via forced medication withdrawal, and complete disregard for justice system integrity—Plaintiff requests punitive damages in an amount the Court deems appropriate based on reprehensibility, ratio to compensatory

5

damages, and deterrence needs.

273. **Injunctive Relief Against Defendant Toribio Palacios, District Attorney:** An order requiring Toribio Palacios, in his official capacity as District Attorney for Hidalgo County, to implement the following reforms to prevent future constitutional violations:

- Mandatory independent verification procedures for pre-indictment review of police reports, specifically prohibiting mechanical rubber-stamping of obviously deficient or fabricated reports;

- Training programs for assistant district attorneys on identifying obvious deficiencies, fabrications, internal inconsistencies, and constitutional violations in police reports and probable cause affidavits;

- Protocols for addressing patterns of problematic reports from specific officers or departments, including referral for investigation and declining to prosecute cases based on unreliable officer submissions;

- Accountability measures for prosecutors who forward deficient reports for indictment without adequate independent review;

- Requirements to document red flags identified during review and reasons for proceeding despite identified deficiencies;

- Procedures for independent investigation when video evidence contradicts police narratives or when probable cause is questionable;

- **Correction of Records:** Implementation of procedures to ensure accurate record-keeping and prompt correction of records when charges are dismissed due to lack of probable cause or fabricated evidence;

274. **Injunctive Relief - Record Correction and Expungement Facilitation:** An order:

- Directing that the declaratory judgment in Item 265 above— specifically that the arrest was procured through fabricated evidence, that no probable cause existed, and that

6

Plaintiff's constitutional rights were violated—shall serve as a judicial finding of constitutional wrongdoing to facilitate Plaintiff's expungement proceedings under Texas Code of Criminal Procedure Article 55.01;

• Requiring Defendants to correct all arrest records, investigative reports, and charging documents in their custody or control to reflect that: (a) the arrest was based on fabricated evidence; (b) the charges were dismissed; and (c) this Court found no probable cause existed for the arrest or prosecution;

• Requiring Defendants to provide Plaintiff with certified copies of: (i) this Court's final judgment and declaratory relief; (ii) all dismissal records; and (iii) all findings and orders related to this case, to facilitate state-level expungement proceedings;

• Requiring the Texas Department of Public Safety to flag Plaintiff's arrest record in all internal databases with the notation: "Arrest Based on Fabricated Evidence - Federal Court Finding of No Probable Cause - See Cause No. 7:25-cv-00393";

• Requiring the Hidalgo County District Attorney's Office to notify any commercial background check services, law enforcement databases, or third-party repositories to which they have previously reported Plaintiff's arrest information that: (i) the arrest was based on fabricated evidence; (ii) the charges were dismissed; and (iii) a federal court found no probable cause existed;

275. **Injunctive Relief Against Individual Defendants:** An order prohibiting Defendants Trooper Pablo Pedroza and Supervisor Alberto Moreno from engaging in similar constitutional violations in the future, including fabricating evidence and affirmatively participating in or personally approving fabricated reports;

276. **Pre-Judgment and Post-Judgment Interest:** Pre-judgment and post-judgment interest on all monetary awards at the maximum rate allowed by law pursuant to 28 U.S.C. § 1961;

277. **Attorneys' Fees and Costs:** Reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988, to the extent Plaintiff retains counsel;

7

278. **Trial by Jury:** A jury trial on all claims, issues, and damages so triable by right or pursuant to Federal Rule of Civil Procedure 38;

279. **Leave to Amend:** Leave to amend this Complaint to add or specify additional damages, injuries, or claims as Plaintiff's ongoing medical evaluation is completed, additional diagnoses are confirmed, and further information is revealed through discovery, expert analysis, or continued treatment. Specifically, Plaintiff is currently undergoing comprehensive evaluation for autism spectrum disorder expected to require approximately four to six months, and the full extent of psychological, medical, and economic injuries may not be known until this evaluation is complete. All such amendments shall relate back to the original filing date pursuant to Fed. R. Civ. P. 15(c)(1)(B) as they arise from the same unlawful arrest, detention, and related conduct alleged in this Complaint;

280. **General Relief:** Such other and further relief as this Court deems just, proper, equitable, and appropriate under the circumstances, including any additional compensatory damages, punitive damages, injunctive relief, declaratory relief, or other remedies established by the evidence at trial.

Civil Action No. 7:25-cv-00393

## CERTIFICATE OF SERVICE

I, Angel Adalberto Alanis, hereby certify that on November 21, 2025, I filed the foregoing *Second Amended Complaint* and attachments with the Clerk of the Court for the Southern District of Texas, McAllen Division, via hand delivery.

I further certify that a true and correct copy of the foregoing document was served on the following counsel of record for Defendant Trooper Pablo Pedroza via **Electronic Mail**:

**Emily Barnes**

Assistant Attorney General

Law Enforcement Defense Division

P.O. Box 12548, Capitol Station

Austin, Texas 78711-2548

Email: emily.barnes@oag.texas.gov

**Angel Adalberto Alanis**

*Plaintiff Pro Se*

Civil Action No. 7:25-cv-00393

# EXHIBIT B

## SUPPLEMENTAL COMPLAINT
## PURSUANT TO FED. R. CIV. P. 15(d)

Attached hereto as Exhibit B is Plaintiff's Proposed Supplemental Complaint Pursuant to Fed. R. Civ. P. 15(d).

Civil Action No. 7:25-cv-00393

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## MCALLEN DIVISION

ANGEL ADALBERTO ALANIS,

    Plaintiff,

                                Civil Action No. 7:25-cv-00393

v.

PABLO PEDROZA, et al.,

    Defendants.

## SUPPLEMENTAL COMPLAINT
## PURSUANT TO FED. R. CIV. P. 15(d)

Plaintiff Angel Adalberto Alanis, proceeding pro se, supplements his Second Amended Complaint by adding the following paragraphs, which continue the sequential numbering from the Second Amended Complaint:

281. On December 17, 2025—after the filing of Plaintiff's Second Amended Complaint in this action—the 389th District Court of Hidalgo County, Texas, granted Plaintiff's petition for writ of habeas corpus under Texas Code of Criminal Procedure Article 11.072 and vacated Plaintiff's February 1, 2024 conviction and plea agreement for aggravated assault. A true and correct copy of the Order Granting Relief is attached to the accompanying Motion for Leave as Exhibit A.

282. The vacatur nullifies the plea agreement in its entirety, rendering it void ab initio, and restores the parties to their pre-plea positions as if the plea agreement never occurred.

2

Civil Action No. 7:25-cv-00393

283. The misdemeanor charges arising from Plaintiff's January 20, 2023 arrest by Defendant Pedroza—which were dismissed on February 1, 2024 pursuant to the now-vacated plea agreement—cannot be revived. More than two years have elapsed since the date of the alleged offenses (accounting for any tolling under Tex. Code Crim. Proc. art. 12.05), and the statute of limitations permanently bars re-prosecution. Tex. Code Crim. Proc. arts. 12.02, 12.05.

284. These criminal proceedings have therefore terminated without a conviction and in a manner that cannot be revived, fully satisfying the favorable termination element of Plaintiff's Fourth Amendment malicious prosecution claims under *Thompson v. Clark*, 596 U.S. 36 (2022), and *Chiaverini v. City of Napoleon*, 602 U.S. 556 (2024).

285. All prior allegations, claims, and prayers for relief in the Second Amended Complaint remain unchanged and are incorporated herein by reference.

Respectfully submitted,

Angel Adalberto Alanis Jr.

1107 N Bethel St

Roma, TX 78584

*Pro Se* Plaintiff

Dated: January 13, 2026

3